National Fuel Gas Distribution Corporation, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent. William Welch et al., Intervenors.

National Fuel Gas Distribution Corporation, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent. Sharon Steel Corporation et al., Intervenors.

National Fuel Gas Distribution Corporation, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent. Sharon Steel Corporation et al., Intervenors.

National Fuel Gas Distribution Corporation, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued March 1, 1983, before President Judge CRUMLISH, JR. and Judges ROGERS, BLATT, WILLIAMS, JR. and DOYLE.

*Michael W. Gang,* with him *W. Russel Hoerner, Morgan, Lewis & Bockius,* and *Heino H. Prahl, Phillips, Lytle, Hitchock, Blain & Huber,* for petitioner.

*Charles F. Hoffman,* Chief Counsel, with him *Allison K. Turner,* Assistant Counsel, *Steven A. McClaren,* Deputy Chief Counsel, and *Albert W. Johnson,* for respondent.

*Philip M. McClelland,* with him *Daniel Clearfield* and *Norman J. Kennard,* for intervenor, Walter W. Cohen, Consumer Advocate.

*George M. Schroeck,* with him *Howard L. Rubenfield* and *Stephen A. George, Buchanan, Ingersoll, Rodewald, Kyle & Buerger,* for intervenor, Sharon Steel Corporation et al.

*Mary Ann Rastatter,* with her *Kenneth C. Spring-irth,* for intervenor, William Welch et al.

OPINION BY JUDGE ROGERS, August 4, 1983:

In these consolidated cases, the National Fuel Gas Distribution Corporation (NFG) seeks review of four orders of the Pennsylvania Public Utility Commission (Commission) entered, respectively, August 28, 1980; September 4, 1980; October 20, 1980; and December 30, 1981.

The Commission's order entered August 28, 1980, disposes of the matter of NFG's Pennsylvania Gas Tariff No. 19, filed by the utility on November 29, 1979, and requesting authorization to collect from its customers additional annual revenues of $21,390,527. The Commission found the proposed rates to be unreasonable and permitted NFG instead to file a tariff or tariff supplement designed to produce an increase in annual operating revenues of $8,549,761. The Commission additionally ordered NFG to submit a proposal for the refund to ratepayers of 80% of its profits from off-system gas sales during a specified period in 1979 and 1980. NFG seeks review of that portion of the order requiring a refund of off-system sales profits.

The Commission's orders entered August 28, 1980, September 4, 1980, and October 20, 1980, refused NFG's request that the increased rates above described be made applicable to service rendered after August 28, 1980, the last day of the seven-month tariff suspension period authorized by Section 1308(d) of the Pennsylvania Public Utility Code (Code), 66 Pa. C. S. §1308(d) and instead ordered that the increased rates be effective as of October 4, 1980. NFG challenges this decision.

Finally, the Commission's orders entered August 28, 1980, and December 30, 1981, require NFG to re-

fund to its consumers $13,886,062 representing costs associated with the purchase of synthetic natural gas (SNG) from Ashland Oil Company of Tonawanda, New York, which costs the Commission found to be imprudently incurred. NFG also contests this refund order.

Many issues have been raised and thoroughly briefed by the parties. Of these, there appears to be general agreement that the most difficult and important to the parties is that of the refunds ordered on account of the SNG purchases referred to above. We will, therefore, begin with a discussion of the issues related to the SNG purchases, will next address the issue of NFG's off-system sales and we will conclude briefly with a reiteration of our view, recently expressed in another decision of this Court, of the effect of Section 1308(d) of the Code with respect to the effective date of rate increases following a suspension. For the reasons that will appear, a number of other issues do not at this time require our resolution.

I.  Costs Related to the Purchase of Synthetic Natural Gas

A.  Factual Background

In the early 1970's, Pennsylvania and, indeed, the whole of the United States, faced a projected natural gas supply shortage of unprecedented dimensions which it was believed would persist for at least a decade. The Commission, on February 1, 1972, following investigation, concluded:

> Nationwide . . . gas supplies are estimated to equal only 72%, 63% and 55% of the projected demand in the years 1975, 1980 and 1985; respectively. Apparently, demand will exceed supply unless new sources of gas are developed.

Iroquois Gas Corporation (NFG's corporate predecessor) responded in 1972 to the call for development

of new gas supplies by entering into a contract with Ashland Oil Company, an unregulated petroleum refiner, by which Ashland agreed to manufacture and Iroquois agreed to purchase for distribution and resale up to 60,000 MCF[1] daily of synthetic natural gas to be manufactured from liquid petroleum feedstocks at Ashland's Tonawanda, New York refinery. The term of the agreement was ten years and the initial price to Iroquois of the SNG was fixed at $1.21 per MCF; this price to rise in accordance with formulae contained in the agreement as Ashland's costs of raw materials and other production costs should increase.

Contemporaneously with a corporate reorganization in which NFG assumed Iroquois' contractual liabilities, extensive plant facilities were constructed by Ashland[2] and, on May 14, 1974, the agreement became effective. Thereafter, for more than four years, Ashland produced and NFG distributed to its Pennsylvania and New York customers,[3] SNG produced pur-

---

[1] "MCF" is a unit of volumetric measure designating one thousand cubic feet. Sixty thousand MCF daily is equivalent to an annual purchase volume of approximately 18 billion cubic feet (BCF) of gas.

[2] These facilities were constructed at a cost in excess of $20 million.

[3] In fact, no Ashland SNG was ever delivered to customers in Pennsylvania. Paragraph 10.3 of the 1972 contract between Ashland Oil Company and NFG provides:

As a material inducement for Seller to enter into this Agreement, Buyer represents and agrees that all gas delivered and sold under this Agreement shall be entirely consumed and utilized within the State of New York. . . .

We are told that this provision was felt by the contracting parties to be desirable in order to avoid federal regulation of what would otherwise have been interstate gas sales. The parties' explanation of the reality which this provision seeks to conceal involves the fungible nature of gas and the principle of gas "displacement." Evidently, although no Ashland SNG was sold in Pennsylvania, the sale of Ashland SNG by NFG to its New York customers permitted other-

suant to this agreement. It is undisputed that during at least part of this period SNG suppliers avoided the necessity of curtailing the supply of gas to NFG's Pennsylvania customers. The Administrative Law Judge, in his recommended decision dated July 16, 1980, evaluated these first years of the agreement's operation as follows:

> The subsequent history through the winter of 1978 indicates that management of National Fuel Gas Company was farsighted in arranging for alternate sources of natural gas at a time of severe shortage.

The forces which impelled the Commission to examine the agreement between Ashland and NFG in these cases were economic. On December 1, 1978, federal legislation[4] relaxing certain pricing controls had the effect of greatly increasing supplies of natural gas to large interstate distributors like NFG and, at about this time, concerted controls on oil price and supply imposed by the Organization of Petroleum Exporting Countries had the effect of greatly increasing the price of the liquid petroleum feedstocks from which Ashland manufactured the SNG. Thereafter, with supplies of natural gas at least temporarily restored and with the price of SNG escalating to over $6.00 per MCF (more than twice the prevailing price for natural gas), NFG's ten-year contractual commitment to purchase Ashland SNG appeared less beneficial than originally envisioned, although NFG's managers persisted in their belief that the SNG supplies produced pursuant to the agreement were necessary safe-

---

wise committed pipeline gas supplies to be sold in Pennsylvania. The parties now see no significance in adopting their convention of describing the circumstances as if Ashland SNG were distributed and sold to NFG's Pennsylvania ratepayers.

[4] The Natural Gas Policy Act of 1978, Act of November 9, 1978, P.L. 95-621, 15 U.S.C. §3301 et seq.

ly to meet NFG's projected customer demand for the fuel.

Sometime in 1978, NFG commenced negotiations with Ashland for lower prices for the SNG supplied or for a supplement to the parties' agreement reducing the amount of SNG which NFG was required to purchase. A proposed supplement reducing NFG's required SNG purchases from 18.2 BCF to 14.1 BCF was executed by the parties and submitted to the Commission for approval on April 5, 1979. A similar submission was made to the New York Public Service Commission which regulates NFG's rates and service to its New York customers. No action on the proposed supplement was taken by the Pennsylvania Commission but the New York Commission, by order issued July 13, 1979, disapproved the supplement and further expressed its intention to deny to NFG any future recovery of costs associated with the purchase of Ashland SNG beyond the $.50 per MCF charge in lieu of purchase provided in Paragraph 4.3 of the 1972 contract which is as follows:

The parties, in recognition of Seller committing itself to the manufacture of gas from petroleum feedstocks for sale to Buyer pursuant to this Agreement rather than engaging in other commercial endeavors with respect to such feedstocks, and further, in view of the parties hereby recognizing the difficulty in ascertaining and proving appropriate damages, agree that unless Buyer is relieved from accepting and purchasing gas under other provisions . . . Buyer agrees to pay Seller in accordance with the terms of Article IX hereof for all gas which Buyer is obligated to purchase hereunder but does not accept and purchase the sum of Fifty Cents (50 cents) for each Mcf of such unaccepted and unpurchased quantity of gas

which Seller could produce from the Plant Facilities under normal operating conditions.

Thereafter, further negotiations produced a second proposed contractual supplement reducing NFG's annual SNG purchase obligation to 10 BCF with a $.50 per MCF penalty for each of the 8.2 million MCF in reduced annual purchases that this figure represented. In late September, 1979, the second supplement was submitted to both the Pennsylvania and New York Commissions for approval. NFG represented in an accompanying letter that in the light of certain characteristics of Ashland's overall operations, the second supplement "reflect[ed] the currently irreducible minimum cost of retaining Ashland SNG as a supply source." In its order dated October 4, 1979, the New York Commission did not take issue with NFG's assessment but formulated the question before it as:

Whether the security of SNG availability over the next year is worth the present cost of approximately $18 million dollars.

This question was answered in the negative; the New York Commission reasoning in pertinent part:

While we recognize that the [second supplement] now before us offers about $10 million more in savings to consumers than the one rejected in our July 13 Order, we are not persuaded that approval of it would be in the best interest of National Fuel's ratepayers. It remains our view that National Fuel's 1972 contract with Ashland can reasonably be construed to give it the right to reduce the contract quantities of SNG that it takes from Ashland in return for payment of 50 cents per MCF for gas not taken. Moreover, it is clear that National Fuel does not now need to take any SNG from

Ashland to meet the needs of its customers. It is also apparent from the latest supplement that Ashland is still unwilling to lower its price of SNG to a level more competitive with pipeline gas and that National Fuel is either unwilling or unable to sell the gas at the price being charged by Ashland. It could only market the SNG by averaging its high cost with the lower cost of other supplies requiring its customers, in effect, to subsidize the off-system sales the SNG makes possible. By accepting the latest supplement in these circumstances, we would be requiring National Fuel's ratepayers now to pay a premium of approximately $18 million dollars annually for SNG with the only clear potential benefit to them being some assurance that this source of supply would be available if needed, sometime in the future. Ashland's price for this is simply too high. In sum, we can find no economically sound justification for the continued purchase of SNG at Ashland's price, particularly in light of the terms of the original contract.[5]

---

[5] The New York Commission's order has been affirmed on appeal to the New York Supreme Court, Appellate Division, *National Fuel Gas Distribution Corp. and Ashland Oil, Inc. v. Public Service Commission of New York*, 86 A.D.2d 901, 448 N.Y.S.2d 539 (1982). Following the decision of the New York Commission, we are told, NFG invoked the "force majeure" provision contained in ¶11.2 of the 1972 contract and refused to accept delivery of any additional Ashland SNG for distribution to its New York customers. Ashland responded by bringing suit in assumpsit against NFG in the United States District Court for the Eastern District of New York. This suit is now pending. NFG now asserts that it was prevented from taking similar action in Pennsylvania by the Commission's failure to take prompt action on the proposed contract supplements. In his separate statement issued May 8, 1981, and docketed to M-FACG-8004 (involving NFG's proposed GCR-3), Commissioner Cawley summarized the situation in these terms:

Following the New York Commission's disapproval, NFG arranged for a meeting with staff members of the Pennsylvania Commission which meeting was conducted on October 15, 1979, and attended by NFG's

---

This unfortunate saga is the story of a good gas supply contract gone sour midway in its existence due to market circumstances beyond anybody's control.

. . . .

NFG could not (even if it had been willing to forgo the off-system sales profits) approach either commission and ask for rulings that the costs were too high, and therefore would we declare as much, thus providing an independent basis for invocation of the force majeure clause. To do so would have been a gross anticipatory breach of the contract which would certainly have exposed NFG to damages in excess of $.50/Mcf of SNG not taken.

Even after the October 4, 1979, New York Commission Order, when the President (no less) of NFG met with representatives of this Commission, it probably is no mere coincidence that the Group Vice President (no less) of Ashland accompanied him to insure that no such candor occurred so as to relieve NFG of further purchases under the SNG Contract as of November 1, 1979.

. . . .

Once squarely presented with the problem, the New York Commission flatly stated that the SNG costs were too high to insure the Ashland SNG as an alternative supply source.

In an attempt to exhaust its obligations under the SNG Contract, NFG proposed a second supplement to this and to the New York Commission. Again, this Commission did not act, but the New York Commission did by finally ruling that only the $.50/Mcf take-or-pay penalty could be recovered from ratepayers.

There was the possibility, however, that this Commission could be persuaded to accept the same proposal which the New York Commission had rejected. NFG was legally required to make every effort to fulfill its obligations under the SNG Contract, and therefore it arranged the October 15, 1979 meeting through our then-chairman.

. . . .

President and Ashland's Group Vice President. There is some disagreement between the parties to the instant appeal as to what, precisely, occurred at this meeting but it can safely be said that members of the Commission's staff advised NFG to obtain a ruling by the Commission on the matter of the proposed second contractual supplement by means of an application by NFG for Commission approval of a revised Gas Cost Rate[6] incorporating the SNG quantity and price fig-

This created a rather favorable proposal: Pennsylvania's GCR could be reduced because of the lowered volume, and because the amounts not taken would be paid for at the rate of $.50/Mcf rather than in excess of $6.00/Mcf.

The alternative, of course, was to decide exactly as the New York Commission did—a ruling that the SNG cost was simply too expensive and that only the $.50/Mcf penalty could be recovered from ratepayers. NFG could then, as it did for the New York Division after the October 4, 1979 New York Commission Order, have invoked the force majeure provision (Section 11.2 of the SNG Contract) for the Pennsylvania Division.

[6] The Gas Cost Rate mechanism for the automatic adjustment of gas cost charges is authorized by Code Section 1307, 66 Pa. C. S. §1307 entitled "Sliding scale of rates; adjustments" and by the Commission's Order of May 21, 1978, Docket No. M-78050055, reported at 52 Pa. P.U.C. 217-220. Such mechanisms are common and are denominated variously "fuel adjustment clauses," "purchased gas adjustment clauses," "escalator clauses," and "pass-through procedures." With differences in the details of operation, each mechanism allows the regulated gas utility to reflect in customer charges changes in the price paid by the utility for the gas it distributes without the necessity of preparation or approval of a revised tariff. That is, these mechanisms, by means of a formula like the one set forth at 52 Pa. P.U.C. page 219, pass through to customers changes in the utility's cost of gas. The constitutional validity of a similar automatic adjustment mechanism, the Energy Cost Rate applicable to electric utilities, was recently upheld in *Allegheny Ludlum Steel Corporation v. Pennsylvania Public Utility Commission*,    Pa.    , A.2d    (No. 45 W.D. Appeal Docket 1982 & No. 5 W.D. Appeal Docket 1983, filed May 4, 1983).

ures proposed in the supplement.[7] The suggested application for Commission action on a Revised Gas Cost Rate Statement No. 2 (GCR—2) was made to the Commission by NFG the next day, October 16, 1979, and was approved by the Commission subject to the following caveat on November 18, 1979:

> Approval of this reduced rate does not constitute any determination regarding the reasonableness of National Fuel's contract to purchase synthetic natural gas from Ashland Oil,

---

The GCR here at issue is a "levelized" adjustment mechanism which means that the cost of gas passed through to the customer remains constant for a specified period—here one year—with an opportunity during subsequent annual periods for the utility to reconcile past over-collections or under-collections by charging increased or decreased rates to the extent that its predictions as to the cost of its purchased gas fell short of or were greater than the utility's actual experience.

GCR-1, governing the period from September, 1978, through August, 1979, was required to be filed by each Class A gas utility on July 1, 1978. GCR-2, the period here at issue, commenced on September 1, 1979, and ended August 31, 1980.

[7] Trial staff's Statement No. 11 contains the following summary:

Q: What was the result of the October 15, 1979 meeting?

A: The result of the meeting was the recommendation that [NFG]—Pennsylvania Division file a reduced Gas Cost Rate (GCR) to reflect the reduction of SNG purchased [described in the second contractual supplement]. . . . [S]taff accepted the suggestion that the Pennsylvania Division of [NFG] take its allocated share of the 10 BCF during the period November, 1979—February 1980 when it has greatest demand and accrue the $0.50 penalty . . . during the remainder of the year. This would also give [NFG] until February 1980 to resolve the issues in New York, thereby benefitting both Pennsylvania customers through a GCR reduction and [NFG] through time to settle the issue with New York.

Inc. or any supplements thereto. Furthermore,
this approval does not affect the Commission's
power to undertake any subsequent investiga-
tions regarding any of the matters here in-
volved.

The supplement then went into effect and delivery of
approximately 3.6 BCF of Ashland SNG was accepted
by NFG during the period from November, 1979,
through February, 1980. On March 4, 1980, in an
order deciding issues raised by a previous tariff re-
vision filing of NFG, the Commission ordered that the
matter of the 1972 contract between NFG and Ashland
be the subject of full investigation on the occasion of
the utility's next general rate increase request.

The opportunity for this investigation was pre-
sented in the context of the general rate increase re-
quest earlier filed by NFG on November 29, 1979, in
which NFG proposed the terms of a revised tariff in-
tended to increase its annual operating revenues by
about $21 million. The proposed new rates were sus-
pended by the Commission, an investigation was com-
menced into their legality and reasonableness, and a
decision by Administrative Law Judge (ALJ) MI-
CHAEL A. NEMEC—recommending an annual revenue
increase of some $7 million—was issued on July 16,
1980. This decision, 142 pages in length and dealing
in great detail with the many issues of property valu-
ation, rate of return, and operating expenses raised by
NFG's tariff filing, further recommends with respect
to NFG's purchases of Ashland SNG action similar
to that taken by the New York Commission, namely,
allowance of recovery in rate charges of costs related
to SNG purchases up to and including the period of
the GCR—2 approved by the Commission on Novem-
ber 18, 1979, but prospective disallowance of costs as-
sociated with any future purchases beyond the $.50
per MCF referred to in ¶4.3 of the 1972 agreement.

The Administrative Law Judge rejected NFG's contention that it should be permitted to continue to make SNG purchases until the end of the contract term in 1984 at the reduced quantities described in its second contract supplement. In support of continued purchases, NFG argued that maintenance of the Ashland gas supply source was necessary to meet anticipated customer demand and that the utility's failure to make such purchases would expose it and, ultimately, its Pennsylvania customers, to unacceptable liability in case Ashland should then bring suit for breach of the 1972 agreement.

On these matters the Administrative Law Judge wrote:

I recommend this Commission in essence adopt the position advocated by OCA [Office of the Consumer Advocate]. No active party to this proceeding, with the possible exception of the Erie complainants, fault [NFG] or [NFG's] predecessor, for originally entering into the contract with Ashland. Both OCA and the New York Commission believe that the contract as initially conceived was appropriate and even commendable under the circumstances then existing. It is simply too much, to my mind, to have expected the management of National Fuel Gas Company in 1972 to have anticipated the coming together of the foreign oil producing states into a powerful block which would then be able to control the price of oil at will. Indeed, the subsequent history through the winter of 1978 indicates that management of National Fuel Gas Company was far-sighted in arranging for alternate sources of natural gas at a time of severe shortage.

I justify my recommendation on the basis that it is no longer reasonable to pass on the

costs of Ashland SNG to Pennsylvania ratepayers. . . . [It] is evident from Trial Staff's calculations of the impact of the removal of SNG from the GCR that *under present supply conditions,* SNG is simply too expensive.

. This Commission has never adopted or approved in any manner the NFG/Ashland contract. This Commission has, however, in the past, permitted the recovery of the costs associated with the SNG as being fair and reasonable. It is also far too speculative at this juncture to speculate on [NFG's] potential liability to Ashland. My recommendation is that this Commission exclude all costs of Ashland SNG from the rates to be set in this proceeding and from the GCR3, to be considered in August, 1980. I further recommend that the question of refunds resulting from alleged unreasonableness of the price of SNG in the past, raised by the Erie complainants and Trial Staff, be reserved until [NFG's] liability, if any, is determined.

The Erie complainants . . . seek a total refund in excess of $56 million on a theory that virtually none of the purchases of Ashland SNG have been reasonable or economically justifiable.

. . . .

In response to the Erie complainants' claim for refunds, NFG has, in addition to a vigorous defense of the reasonableness of the contract with Ashland, plead a four year limitation on the collection of refunds, Public Utility Code, §1312, and, further stated that all refunds sought here are barred on a theory or principle of Commission made rates.

Trial Staff also urges a refund, but one related to GCR2 as revised in October, 1979.

Trial Staff contends that the revision occurred as a result of an understanding by this Commission that the suggested reduction in SNG would result in Pennsylvania receiving its historic proportionate share, about 37%, of the total take by [NFG] from Ashland. Instead, the amount of SNG taken or "allocated to Pennsylvania during the four months of October, 1979, through January, 1980, constituted virtually the entire output of the Ashland refinery for the period of GCR2, September 1, 1979 through August 30, 1980. Trial Staff contends that the portion of SNG properly allocated to Pennsylvania customers should approximate 37% of the total production for the period of GCR2 and that the excess funds collected should be used to provide a credit during the period of GCR3, September 1, 1980, through August 30, 1981.

However, Trial Staff provides no suggestions of a basis for ignoring the order establishing GCR2 Revised. . . . While, by its terms, GCR2 Revised is subject, constantly, to review and revision, I interpret that to be a prospective matter solely. The authority of this Commission to order refunds would appear to be limited to the circumstances set forth in Section 1312 of the Public Utility Code, 66 Pa. C.S.A. §1312. If so, accepting Trial Staff's recommendation would require a finding that the rate set by GCR2 Revised was unjust or unreasonable.

It is suggested that the better course is, at present, to do nothing more than eliminate all costs associated with Ashland SNG from base rates and from the GCR3. Certainly Pennsylvania ratepayers cannot be responsible for any liability of [NFG] to Ashland through August,

1980. Thereafter, should [NFG] be found to be liable for contract damages and seek contribution from Pennsylvania ratepayers this Commission could then institute a thorough review of the entire matter. Included in a thorough review would be consideration of circumstances which would permit an offset of the final damages claimed.

· The record establishes that the SNG is not needed, at least until the end of the contract period. . . . Further, the current price is grossly uneconomic. For all of the foregoing, I recommend that this Commission refuse to recognize any claim for the cost of Ashland synthetic natural gas in Distribution's next gas cost rate filing, GCR3.

By order adopted August 28, 1980, the Commission rejected as unreasonable NFG's proposed Tariff Supplement No. 19; authorized NFG to file a revised tariff designed to produce operating revenues of approximately $220 million, an increase in annual operating revenues of some $8.5 million; and, with respect to the recovery of costs associated with Ashland SNG purchases, denied future recovery during the GCR—3 period beginning in September, 1980, and ordered a refund to ratepayers of SNG costs related to the period between September, 1979, and August, 1980, made the subject of the GCR—2 approved by the Commission in November, 1979. The details of the refund were left to future evidentiary investigation which proceeding was concluded by the Commission's Opinion and Order entered December 30, 1981, and required:

2. That National Fuel Gas Distribution Corporation refund to its Pennsylvania ratepayers the sum of $13,886,062, by reason of collection of costs of Ashland Synthetic Natural Gas, to-

gether with interest at the legal rate (6 per cent per annum) from the months in which the principal of the refund was collected through the date of entry of this order, in five equal increments, by means of the Gas Cost Rate Billing factor.

NFG now seeks review of this refund requirement.

## B. Legal Issues

NFG raises three major challenges to the Commission's decision that it refund some $13 million to its Pennsylvania customers expended by the utility for Ashland SNG. First, it is argued that the Commission's order and accompanying opinion inadequately reveal the factual and legal underpinnings of the decision. Second, to the extent that it can be inferred that the Commission's decision is predicated on a finding that NFG's managers abused their discretion in their continued purchase of Ashland SNG after September, 1979, NFG asserts that the evidence of record is insufficient to support such a finding. Finally, NFG contends, on the basis of an analysis of a number of statutory provisions, that the Public Utility Code does not authorize a refund to ratepayers under the circumstances here presented. We will consider each of these arguments below. As we will indicate, each argument possesses considerable force and their aggregate effect is to require our return of this matter to the Commission for further proceedings the purpose of which we will describe.

(1) Inadequacy of the Adjudication

Section 703(e) of the Pennsylvania Public Utility Code, 66 Pa. C. S. §703(e) requires a measure of decisional specificity in Commission adjudications and provides as follows:

(e) Decisions by commission.—After the conclusion of the hearing [required by subsections

b, c, and d], the commission shall make and file its findings and order with its opinion, if any. Its findings shall be in sufficient detail to enable the court on appeal, to determine the controverted question presented by the proceeding, and whether proper weight was given to the evidence.

This provision is for the purpose of aiding the reviewing court and serves as explicit authorization to return the matter to the Commission where the adjudication subject to review is insufficiently detailed to permit the court to assess the sufficiency of the evidence to support the Commission's findings and to evaluate the Commission's resolution of the controverted legal issues. *Noerr Motor Freight v. Pennsylvania Public Utility Commission,* 180 Pa. Superior Ct. 62, 118 A.2d 248 (1956) ; *UGI Corporation v. Pennsylvania Public Utility Commission,* 49 Pa. Commonwealth Ct. 69, 410 A.2d 923 (1980). A remand is also required in cases involving the Commission's exercise of its discretion where the Commission's statement of what it believes to be the controlling facts is inaccurate or inadequately supported by the record even if the erroneous statement is arguably gratuitous and is unnecessary to support the decision. *Philadelphia Suburban Water Co. v. Pennsylvania Public Utility Commission,* 425 Pa. 501, 511, 229 A.2d 748, 752 (1967). Whether to require a refund under Code Section 1312 of monies previously collected by a utility is a matter charged by Subsection (a) of that provision to the sound discretion of the Commission and the principle last stated is, as we will indicate, directly controlling in the instant case.

On the matter of the $13 million refund of costs associated with the purchase of Ashland SNG during the GCR—2 period; the most difficult issue presented by these several appeals, we have set forth above at some

length excerpts from the ALJ's July 16, 1980, decision recommending that no refunds be required because prior Commission approval of NFG's GCR—2 precluded such action; because Section 1312 of the Code, having to do with refunds, did not authorize a refund in this case; because the caveat appended to the GCR—2 Commission approval reserving the power of further review could be interpreted as authorizing prospective relief only; and because the matter of NFG's liability to Ashland for breach of the 1972 contract had not been decided. Before the Administrative Law Judge, the Commission's trial staff argued that a refund of monies collected during the GCR—2 Period was appropriate because the Commission's GCR—2 approval had been based, in part, on a misapprehension as to the portion of Ashland's SNG output intended to be sold in Pennsylvania during the GCR—2 period. In its exceptions to the ALJ's recommended decision, the Commission's trial staff renewed this contention and further argued that a refund of monies collected during the GCR—2 period and expended by NFG for Ashland SNG was not retroactive relief but, instead, was simply the return of "over-collections." The Consumer Advocate, in its exceptions, did not argue that a refund was necessary or appropriate.

As we have indicated, the Commission rejected the ALJ's recommendation that Ashland SNG costs be disallowed on a prospective basis only and, apparently, discerned error in each of the recommendation's supporting premises. The whole of the Commission's substantive discussion on this issue is set forth below.

> The Administrative Law Judge also recommended no refunds for the GCR—2 period asserting that refunds for such period would require a finding that the GCR—2 rate was unjust and unreasonable. Staff has excepted that such a finding is not required.

. . . .

As to the period September 1979 through August 1980 (the GCR—2 period), the costs are subject to audit. Attachment B to the Gas Cost Rate for class "A" Gas Utilities—M-78050055 provides, in pertinent part, that:

The application of the Gas Cost Rate shall be subject to continuous review and to audit by the Commission at such intervals as the Commission shall determine. The Commission shall continuously review the reasonableness and lawfulness of the amounts of the charges produced by the Gas Cost Rate and the charges included therein.

If from such audit it shall be determined, by final order entered after notice and hearing, that this clause has been erroneously or improperly utilized, the company will rectify such errors or impropriety, and in accordance with the terms of the order apply credits against future Gas Cost Rates for such revenues as shall have been erroneously or improperly collected. The Commission's order shall be subject to the right of appeal.

While the audit hearings on the costs incurred during the GCR—2 period by the Respondent and other gas utilities will begin in the near future, based upon the record developed in this proceeding which has specifically included an investigation of the SNG contract between Distribution and Ashland, we find that the costs of Ashland SNG should be disapproved as imprudently and improvidently incurred for the period September 1979 through August 1980. Distribution had available to it more than ample

supplies for its customers at prices approximately $2.50 per Mcf, rather than the $6.00 plus price for Ashland SNG; in the circumstances, the alternative of foregoing purchases of Ashland SNG and incurring a penalty of $.50 per Mcf under the take or pay clause, was the clearly indicated prudent course of action to follow.

Thus, reasoning backward from the result, it may be inferred that the Commission was unpersuaded by the arguments having to do with limitations on refunds codified in Section 1312 of the Code, the applicability of the doctrine of Commission made rates, and the prospective nature of post-approval audits of the GCR—2, which had prevailed before ALJ NEMEC. The only explicit rationale offered by the Commission for its rejection of these arguments is that, in the Commission's view of the evidence of record, NFG "had available to it more than ample supplies" of gas apart from the expensive Ashland SNG and "the alternative of foregoing purchases of Ashland SNG and incurring a penalty of $.50 per MCF under the take or pay clause, was the clearly indicated prudent course of action to follow." The Commission's refund order does not seem to be based on its acceptance of the trial staff's position that a refund was required by the misapprehension as to the interstate distribution of Ashland SNG during the last months of 1979 and the first months of 1980.

From the cryptic statements contained in its decision, one might hazard a guess that the Commission is here announcing the principle that a regulated utility should on the ground of improvident management be required to refund monies previously collected from ratepayers and expended by the utility for supplies of raw materials necessary to its service although no fraud, collusion or other wrongdoing is alleged with respect to the purchases; although the sup-

plier is not affiliated in any respect with the utility; although the fact and amount of the purchases, the purchase price and the corresponding rates charged were in complete compliance with applicable law and the effective tariff; and although the effective rates did not produce revenues to the utility in excess of a fair return on the fair value of the utility's property used to provide the public service. For the reasons we will detail in Section (3) below, such a principle is novel and, in the light of the authorities advanced by the Commission in its written argument to this Court, without discernible foundation.

However, recognizing the possibility that we have misconstrued the Commission's decision and the basis for it, we will return this matter for a more thorough explication of the factual and legal bases for the refund order.

(2)  Sufficiency of the Evidence to Support a Finding of Managerial Imprudence: Availability of Alternative Gas Supplies

NFG argues that to the extent that the Commission's order disallowing SNG costs and requiring a refund to ratepayers of monies previously collected and expended is based on a factual finding of managerial imprudence, the order must be set aside as the evidence of record is insufficient to support such a finding.

On this score the Commission refers in its opinion to two critical findings: (1) ''[that] Distribution had available to it more than ample supplies'' of gas at a lower price than Ashland SNG and (2) ''[that] the alternative of foregoing purchases of $.50 per MCF under the take or pay clause, was the clearly indicated prudent course of action to follow.'' As to the first of these findings NFG contends that the facts show just the contrary. As to the second, NFG contends that the

Commission has no jurisdictional power to interpret the 1972 contract between Ashland and NFG. For reasons developed briefly in the margin, we reject both of these contentions.[8]

---

[8] The evidence of expert witness George Donkin, discussed at a later point in this opinion, substantially supports a finding that as of April, 1980, gas supplies available to NFG apart from the Ashland SNG would be adequate to meet NFG's anticipated customer demand during the period from April, 1980 until the May, 1984 contract expiration date.

We firmly reject NFG's position that it may, by entering into unsupervised contracts with unregulated third parties, deprive the Commission of the power to rule on the reasonableness of NFG's rates. *See Peoples Natural Gas Company v. Pennsylvania Public Utility Commission*, 47 Pa. Commonwealth Ct. 512, 409 A.2d 446 (1979).

The true basis of NFG's objection to the Commission's resort to ¶4.3 of the 1972 contract seems to be that, in NFG's view, the issue is not whether the provision is in fact a take-or-pay clause but whether NFG's managers reasonably believed at the time of the GCR-2 Ashland SNG purchases instead that ¶4.3 is a liquidated damages provision which, if invoked, might be stricken and severed from the contract as containing an unreasonably low measure of damages. We concur in this formulation of the issue but disagree that the evidence of record compels the conclusion that NFG's interpretation of ¶4.3 was reasonably embraced by its managers. It will be remembered that the only tribunal to rule on the issue, the New York Commission, had prior to the GCR-2 period, held that ¶4.3 was a take-or-pay clause limiting NFG's liability for an SNG purchase curtailment to $.50 per MCF.

Nevertheless, NFG asserts that it relied on an opinion of its New York counsel that ¶4.3 might be interpreted as a liquidated damages clause, might then be stricken, and that NFG might be at that point exposed to more than $200 million in liability to Ashland. We have examined the opinion-letter of counsel referred to by NFG. It is dated April 23, 1979, nearly six months before the New York Commission's October 4, 1979, Order concluding "that [NFG]'s 1972 contract with Ashland can reasonably be construed to give it the right to reduce the contract quantities of SNG that it takes from Ashland in return for payment of 50 cents per MCF for gas not taken."

However, NFG further argues as to the first of the Commission's findings to the effect that other cheaper supplies were adequate and available, that it misses the mark and leaves unresolved the true issue—that of the propriety of NFG's continued adherence to the Ashland SNG contract. Specifically, NFG views as the crucial issue in the matter of the adequacy of alternative gas supplies, not whether it could be said

Moreover, the opinion-letter relied on does not contain any view of the likelihood or reasonableness of an interpretation of ¶4.3 as a liquidated damages clause but, instead contains the following description of the scope of the opinion: "At your request, we have developed below the argument that the clause constitutes a liquidated damage clause and sketched in some of the consequences of acceptance of this view. I stress that this document does not constitute an opinion relative to the appropriate interpretation of the clause." That is, in the opinion letter now relied on by NFG, counsel were asked to proceed from the assumption that ¶4.3 might be interpreted as a liquidated damages clause. The opinion can serve as no support for the reasonableness of NFG's position that the assumption might be correct.

Finally, we must note our assessment of the conclusion of counsel contained in the April 23, 1979, document, and reasserted by NFG in this appeal, that the consequence of an interpretation of ¶4.3 as a liquidated damages clause would be to require that the clause be stricken as embodying a damage measure unreasonably low. This conclusion is inherently implausible for several reasons. First, the reasonableness of a liquidated damages measure, as NFG concedes, must be ascertained as of the time of the execution of the contract containing the provision; here the 1972 contract. The price for SNG first fixed by ¶3.3 of the contract is $1.21 per MCF and we are given no reason why a penalty of over 40% of the contract price for gas not produced or taken is so unreasonable as to require its excision from the contract. In addition, no persuasive authority is given for the proposition that a liquidated damages clause is unenforceable if the measure of damages therein contained is too low. Of course, a liquidated damages clause embodying an unreasonably high measure of damages constitutes a penalty and, therefore, is unenforceable. But the consequence of a damage measure unreasonably low would seem to be to render the mutual promises contained in the contract illusory.

after the event that cheaper alternative supplies were available during the GCR—2 period and in the foreseeable future, but whether at the time of the managerial decisions now condemned, NFG knew or should have known that a continuing supply of SNG was unnecessary. The Commission's decision is ambiguous on this point. It is conceivable that a finding of managerial abuse could be founded on NFG's failure to invoke the take or pay clause of ¶4.3 regardless of whether the Ashland SNG was necessary to meet anticipated customer demand. It will be remembered that the New York Commission decided that maintenance of the Ashland SNG supply was simply too expensive even if some risk of supply shortfall was entertained by its abandonment. However, we will not dismiss the Commission's assertion with respect to the adequacy of gas supplies, one of the two substantive declarations in the Commission's decision, as mere surplusage; but we will interpret the decision to mean that in the Commission's view NFG's managers abused their discretion both because of the availability of alternative gas supplies and because of the availability of the escape clause provided by ¶4.3 of the 1972 contract.

As a general matter, utility management is in the hands of the utility and the Commission may not interfere with lawful management decisions, including decisions related to the necessity and propriety of operating expenses, unless, on the basis of record evidence, it finds an abuse of the utility's managerial discretion. *City of Philadelphia v. Pennsylvania Public Utility Commission,* 174 Pa. Superior Ct. 641, 102 A.2d 428 (1954). Moreover, in *Pittsburgh v. Pennsylvania Public Utility Commission,* 370 Pa. 305, 88 A.2d 59 (1952) where the issue was whether certain of the utility's pension costs could be disallowed on a showing that the utility's management acted imprudently by fail-

ing at the pension program's initiation to adopt an accrual method of accounting, the Court held that the operating expenses could not be disallowed, reasoning as follows: "In any event, no abuse of discretion was here proved and none can be inferred based solely upon hindsight. . . ." *Id.* at 319, 88 A.2d at 64. The Court further approved as "[p]articularly appropriate" the following discussion contained in *Petitions of New England Telegraph and Telephone Co.,* 80 A.2d 671, 683 (Vermont 1951):

> The only difficulty is the delay in starting the freezing payments [necessary to convert the pension accounts to a full accrual basis]. Judged by hindsight, it is now very apparent that freezing payments should have been started in 1929, but we think that the management must be judged by what it then knew or ought to have known.

*Id.* Thus, the Commission having here condemned NFG's Ashland SNG purchases on the ground that the Ashland SNG supply was unnecessary, the issue in the instant case is whether NFG's managers, at the time of the purchasing decisions here condemned, knew or should have known that adequate and less expensive alternative supplies of gas were then, and later would be, available.

On the issue of the adequacy of alternative supplies of gas, the Commission's legal staff brings to our attention in its brief the following testimony of George Donkin, an expert witness called by the intervenor Office of the Consumer Advocate, which we reproduce in pertinent part including the emphasis placed on certain portions by the Commission:

> Q. Mr. Donkin, you have shown that National Fuel will be able to meet its market requirements through 1984 without purchases of

Ashland SNG. If current supply forecasts are not fulfilled, would that create a justification for continued or renewed purchases of SNG from Ashland?

A. No. In terms of any reasonable cost/ benefit assessment, there is no economic justification for either a continuation or a renewal of the Ashland supplies by Gas Company or National Fuel to meet all or portions of the system's market requirements. *As I have shown, current forecasts of the Company's prospective supply and demand profile show that a supply surplus will exist during the foreseeable future. If, however, less gas is available from historic sources than is now anticipated, then any potential supply shortfall could be alleviated by alternative supplies at costs significantly below the cost of Ashland SNG.*

This testimony given by Donkin in April, 1980, provides an adequate factual foundation for the Commission's August 28, 1980, order insofar as it forbids prospectively any recovery by NFG of Ashland SNG costs.[9] Indeed, to the extent that other matters are addressed by the testimony, it is unresponsive to the question posed. On the basis of this evidence and the reasoning contained in the ALJ's decision set forth above and adopted by the Commission, we reject NFG's contention that the Commission erred in its prospective disallowance of Ashland SNG costs.[10]

---

[9] For a description of the natural gas supply emergency obtaining in Massachusetts during the winter following Mr. Donkin's sanguine supply projections which emergency compelled the Commonwealth's Governor to close all gas-heated schools on January 16, 1981, *see Boston Gas Company v. Department of Public Utilities*, 387 Mass. 531, 441 N.E.2d 746 (1982).

[10] NFG also makes a number of not altogether clear arguments generally complaining that the Commission may at some point in

However, this testimony provides no support for the conclusion that NFG's managers knew or should have known before the last SNG purchases in February, 1980, that SNG supplies were not then and were not likely to be in the future necessary. In this regard, the obvious bears repetition. This record can support no conclusion other than that of the extreme fugacity of gas supplies and their estimates. As we have noted, in 1971 the Commission predicted that the available domestic gas supply in 1980 would fall short of demand by some 37%. George Donkin elsewhere in the record testified:

> [D]uring the mid-1970's, it was generally believed that the observed declines in domestic gas production would likely continue, although at a somewhat more moderate rate, into the 1980's. These predictions have not proven accurate. Total U.S. marketed gas production stabilized.

NFG acted in what the parties concede was laudatory responsiveness to the Commission's call in 1972 for the development of new sources of gas supply. It may well be, as George Donkin testified, that "current forecasts . . . show that a supply surplus will exist during the foreseeable future" but that opinion alone will not support criticism of a utility's past purchases of more expensive SNG made in furtherance of the utility's determination to maintain the alternative synthetic gas supply.

The Office of the Consumer Advocate suggests in its brief that certain documentary submissions of NFG support a finding by the Commission that gas

---

the future disallow NFG's recovery from its customers of the $.50 per MCF penalty charge described in ¶4.3 of the 1972 contract. At the present, Paragraph 5 of the Commission's Order adopted December 18, 1981, permits this recovery and, in our view, NFG's contentions in this regard are not now ripe for disposition.

supplies apart from the Ashland SNG were known by NFG to be adequate. We cannot accept this suggestion. The documents referred to describe in graphic and tabular form NFG's gas requirements versus supply experience over an eight-year period from 1971 through 1978 and predict the extent of future requirements and supplies in the period from 1980 to 1984. The first of these documents is dated September 4, 1979, and shows that as of that date NFG's managers were aware that Ashland SNG had been necessary to meet the utility's customer demand in every year since the synthetic gas was first produced in 1974 and was predicted to be necessary in every future year studied with the possible exception of 1980 depending on the prevailing winter weather conditions during that year. No information is presented as to whether in September, 1979, when NFG commenced the GCR—2 Ashland SNG purchases here condemned, NFG's managers reasonably believed Ashland SNG to be a necessary source of supply to meet customer demand between that date and February, 1980, when all Ashland SNG purchases ceased. Moreover, and not surprisingly, this document, which NFG prepared and introduced as an exhibit, supports rather than refutes the utility's position that in September, 1979, its managers reasonably believed that Ashland SNG was necessary to meet anticipated customer demand for gas during the period from 1980 until the Ashland contract termination date in 1984.

The second of the documents referred to by the Office of the Consumer Advocate, a bar graph styled "National Fuel Gas Company System Supply & Requirements Official Estimate" and dated December 18, 1979, is even less supportive of its position on this issue and, in our judgment, the assertion that this document reveals NFG's internal predictions as to the necessity of Ashland SNG could be described as disin-

genious. Again the document is one of the utility's exhibits and, as the identifying witness testified, was intended not to present predicted future SNG use but to present the extent to which the whole of the utility's known supplies taken together would fall short of extrapolated demand under possible weather conditions in each year from 1981 to 1984. But even if the document were subject to the interpretation the Consumer Advocate would give it, the effect would be to reemphasize by comparison to the September 4, 1979, document described above, the unpredictability even in the short term of available gas supplies during the precise period in which NFG's predictive failure is here castigated. The December 12, 1978, document, speaking as of a date subsequent to many if not most of the GCR—2 Ashland SNG purchases, cannot support a finding that the utility knew at the time of the earlier purchases that SNG would not be needed.[11]

In sum, we have been directed to no record evidence which would support a determination that NFG's continued purchases of Ashland SNG during the period from September, 1979, to February, 1980, were imprudent because the utility's managers either knew or should have known that other available supplies of natural gas were adequate to meet anticipated demand.

---

[11] The Office of the Consumer Advocate also brings to our attention on this issue the testimony of expert witness Ralph M. Griffin called by the Commission's trial staff. However, some of the record pages referred to in the Consumer Advocate's written argument contain the testimony of Mr. Griffin on the subject of whether the exclusive use of Ashland SNG by New York customers of NFG justifies the disallowance of Ashland SNG costs from Pennsylvania rates. Other testimony of Mr. Griffin is unhelpful for the reasons explored in the text, that is, because it is apparently descriptive of current knowledge and forecasts as to gas availability and does not purport to express any opinion as to the knowledge which NFG's managers either possessed or should have possessed at the time of the purchasing decisions here found to have been imprudent.

In its written argument presented to this Court, NFG explains by reference to the positions of the parties below, the paucity of evidence intended to support directly a finding that NFG's managers knew or should have known that Ashland SNG was unnecessary.

The Commission Trial Staff did not take the position, during the hearings before the Administrative Law Judge or in exceptions filed with the Commission, that purchases of Ashland SNG during the winter of 1979-1980 were imprudent. The Commission Trial Staff took the position that Pennsylvania customers should pay for only 36% of the purchases actually made during the period. Thus, the Commission Trial Staff conceded, by its position, that purchases of Ashland SNG were prudent.

The Consumer Advocate did not take the position in the rate proceeding, at R-79090956, that Distribution's purchases of SNG during the period September 1, 1979 through August 31, 1980, were imprudent and did not contend in that proceeding that there should be refunds. The Consumer Advocate has adopted the refund position only after the Commission's order of August 28, 1980, at R-79090956.[12]

Nevertheless, the Commission here bases its ultimate finding of abuse of managerial discretion on the asserted availability of alternative gas supplies and makes no reference to the position of its trial staff, the only party excepting to the ALJ's purely prospective relief recommendation, that refunds are required on account of the distribution of Ashland SNG sup-

---

[12] It is not argued that this account of the parties' position below is inaccurate and our review of the exceptions filed by the Office of the Consumer Advocate and by the Commission's legal staff supports it.

plies during the GCR—2 period as between NFG's Pennsylvania and New York customers.

Our scope of review does not permit a broad inquiry into whether an abuse of NFG's managerial discretion is here made out by, for example, the challenged interstate distribution of SNG purchases during GCR—2 or by the price alone paid for Ashland SNG assuming NFG reasonably believed other gas supplies might be inadequate. On this score, as we discussed above, the New York Commission determined that the premium paid for the "insurance" of an available Ashland SNG supply was simply too high —a determination grounding prospective but not retroactive disallowance of SNG costs. We must review on its express terms the Commission's decision and by those terms NFG's imprudence is predicated on a finding that the utility did not act appropriately on knowledge it possessed or ought to have possessed that gas supplies apart from the Ashland SNG were adequate. We are unable to find in the record substantial support for this predicate of fact. This case is thus distinguishable from *Metropolitan Edison v. Pennsylvania Public Utility Commission*, 62 Pa. Commonwealth Ct. 460, 437 A.2d 76 (1981) *allocatur denied* February 23, 1982, where, in a factual context quite similar to that here presented, we upheld the Commission's refund order. In *Metropolitan Edison* we held that the evidence of record, including expert testimony by three witnesses described in the opinion, substantially supported the Commission's finding of the utility's abuse of its managerial discretion.

The vastness of this record and the sparseness of the Commission's discussion impels us to return the matter to the Commission for an explanation of the evidentiary basis for its conclusion that Ashland SNG purchases during the GCR—2 period constituted an abuse of NFG's managerial discretion.

### (3) Power of the Commission to Order Refunds under these Circumstances

An insurmountable obstacle to definitively addressing the topic of the Commission's power to order the refunds is the failure of the Commission to describe in sufficient detail what it found the relevant circumstances to be. We also note that we were not presented with and, therefore, did not decide in the *Metropolitan Edison* case discussed above the question of the origin or scope of the Commission's refund power with respect to monies collected pursuant to a utility's approved automatic rate adjustment mechaism. Nevertheless, NFG argues that even if the relevant circumstances include managerial imprudence, there is no authority in the Public Utility Code or elsewhere for the requirement of refunds in this case.

As we have indicated, in the opinion accompanying its August 28, 1980, order the Commission relies for its authority to order refunds on that portion of its May 21, 1978, order establishing the Gas Cost Rate mechanism of automatic rate adjustments which reserves to the Commission the power to audit and review charges produced by the utility's GCR and authorizes refunds in the form of customer credits against future charges "[if] from such audit it shall be determined . . . that this clause has been erroneously or improperly utilized. . . ." Although the use of the term "clause" is obscure, we understand this portion of the Commission's May 21, 1978, order to authorize refunds only when the utility's use of the mandatory Gas Cost Rate formula is erroneous or improper as, for example, when the utility's projected estimates of gas consumption or pipeline gas prices during the future GCR period turn out to be inaccurate.

Indeed, Section 1307(e) of the Code, 66 Pa. C. S. §1307(e), the only statutory provision concerning re-

funds in the context of automatic rate adjustment mechanisms, contains a similar provision authorizing refunds in those instances where the utility's projections overestimate the cost of gas and, therefore, the utility has collected more money from utility customers pursuant to the GCR than was needed by the utility to pay for this expense.

Such considerations seem not to be involved in the instant case. It is not here argued and the Commission did not find that NFG collected from its customers pursuant to GCR—2 any more than was actually required by the utility to pay for the gas supplied. Neither is it asserted nor was it found that any of the figures, projections, or estimates submitted by the Company in support of its GCR—2 were incorrect or that its use of this formula or the Gas Cost Rate mechanism in general was either improper or erroneous.

Perhaps recognizing this difficulty with the Commission's August 28, 1980, refund order as written, neither the Commission's legal staff nor the Office of the Consumer Advocate now seriously argue that the May 21, 1978, Commission order or Section 1307(e) of the Code justify the instant refund. Instead both parties refer us to Section 1312 of the Code, 66 Pa. C. S. §1312 having to do with refunds generally and to two recent opinions of this Court in cases involving the Commission's disallowance from rate base of plant construction costs found to have been imprudent (*Park Towne v. Pennsylvania Public Utility Commission*, 61 Pa. Commonwealth Ct. 285, 433 A.2d 610 (1981)) and the disallowance from rate base of an amount found to represent excess generating capacity. (*Philadelphia Electric Co. v. Pennsylvania Public Utility Commission*, 61 Pa. Commonwealth Ct. 325, 433 A.2d 620 (1981)).

The issue of the scope of the Commission's power to order a refund of monies previously collected from customers and expended by the utility to provide the customers' service was not presented or decided in either of the cases cited. The exclusion of imprudent or unused capital outlays from a utility's rate base involves very different considerations as we explained in *Philadelphia Electric Co. v. Pennsylvania Public Utility Commission*, at 330, 433 A.2d at 623:

> It is important to record that only a return on the investment is involved. The PUC did not order these units retired and it allowed PECO to continue to recover from ratepayers the expenses of operating and maintaining the units in question, including depreciation. PECO's investors were denied a return *on* their investments in these units; however, they were allowed the return *of* their investments in them. (Emphasis in original.)

Thus, the issue in *Philadelphia Electric Co.* and in *Park Towne* was whether the utility's investors could be denied a return on capital expenditures imprudently or improvidently undertaken. No capital expenditures are involved in the instant case; this case concerns the expense of SNG purchased by NFG and resold to its customers. Moreover, the issue here is not whether NFG should be permitted to profit from the resale of Ashland SNG—the GCR contains no profit component and serves only to allow the utility to collect from customers an amount equal to the cost of the purchased gas to the utility—but, instead, the issue is whether the utility may be denied reimbursement for necessary expenses actually incurred. The cases cited are inapposite.

Section 1312(a) of the Code, 66 Pa. C. S. §1312(a) also relied on to support the refund order, is, in pertinent part, as follows:

## §1312.  Refund

(a)  General Rule.—If, in any proceeding involving rates, the commission shall determine that any rate received by a public utility was unjust or unreasonable, or was in excess of the applicable rate contained in an existing and effective tariff of such public utility, the commission shall have the power and authority to make an order requiring the public utility to refund the amount of any excess paid by any patron, in consequence of such unlawful collection, within four years prior to the date of the filing of the complaint, together with interest at the legal rate from the date of each such excessive payment. In making a determination under this section, the commission need not find that the rate complained of was extortionate or oppressive.

Refunds are authorized pursuant to Section 1312 only if the Commission determines that rates received by the utility (a) were unlawful; or (b) were unjust or unreasonable; or (c) were in excess of the rates contained in the utility's applicable tariff filing. Here, the refunds relate to customer charges lawfully made in accordance with the previously approved GCR—2. Moreover, the Commission's adjudications now subject to review contain no determination that the utility's *rates* during the GCR—2 period, in contradiction to its expenditures for Ashland SNG, were unjust or unreasonable. The distinction is critical. A determination that a utility's rates are unjust or unreasonable usually rests on a factual finding that the imposition of those rates unreasonably benefits the utility's investors at the expense of the utility's ratepayers, that is; that the rates constitute a species of ''unlawful taxation of consumers.'' *Pennsylvania Public Utility Commission v. Pennsylvania Gas &*

*Water Company,* 492 Pa. 326, 339, 424 A.2d 1213, 1220 (1980) *cert. denied,* 454 U.S. 824 (1981). This finding, in turn, is typically established by evidence that imposition of the challenged rates produces revenues in excess of a fair return on the fair value of the utility's property used to provide the regulated service. *Pennsylvania Gas & Water v. Pennsylvania Public Utility Commission,* 72 Pa. Commonwealth Ct. 331, 340-341, 456 A.2d 1126, 1131 (1983) (authorities collected) *allocatur granted.*

The Commission made no finding in the instant case that the charges collected pursuant to GCR—2 (either alone or in combination with other charges) produced revenues in excess of a fair return on the fair value of NFG's property or that those charges unreasonably benefitted the utility's investors because, it is conceded, the GCR—2 charges produced no return to the investors and no revenue to the utility beyond reimbursement for gas purchase expense actually incurred.

This case is thus distinguishable from *Magee Carpet Co. v. Pennsylvania Public Utility Commission,* 174 Pa. Superior Ct. 438, 102 A.2d 229 (1954) where it was held that the utility had been properly ordered to refund monies collected pursuant to its fuel adjustment clause because the clause had been unlawfully employed to augment base rates, that is, to reap a profit. No such artifice has here been alleged and the situation presented in *Magee* is now the express subject of refund authorization pursuant to Code Section 1307(e). Finally, we note that Section 2102 of the Code, 66 Pa. C. S. §2102 requires contracts for purchase between regulated utilities and affiliated interests to be approved by the Commission and, in subsection (c) provides as follows:

> (c)   Disallowance of excessive amounts.—
> If the commission shall determine that the

amounts paid or payable under a contract or arrangement filed in accordance with this section are in excess of the reasonable price for furnishing the services provided for in the contract, or that such services are not reasonably necessary and proper, it shall disallow such amounts, insofar as found excessive, in any proceeding involving the rates or practices of the public utility. In any proceeding involving such amounts, the burden of proof to show that such amounts are not in excess of the reasonable price for furnishing such services, and that such services are reasonable and proper, shall be on the public utility.

NFG and Ashland Oil Company are not, so far as the evidence here reveals, affiliated interests within the meaning of the Code and no statutory provision brought to our attention creates supervisory authority in the Commission with respect to contracts generally as is created with respect to contracts with affiliates by the Code's Chapter 21.

The Commission has only those powers expressly provided in the Code. *Swarthmore Borough v. Public Service Commission,* 277 Pa. 472, 121 A. 488 (1923). Indeed, the Supreme Court recently reaffirmed this principle in *Pennsylvania Public Utility Commission v. Philadelphia Electric Co.,* Pa. , 460 A.2d 734 (1983) where it held that the Commission possesses express supervisory powers under Code Section 1903, 66 Pa. C. S. §1903, with respect to securities offerings by utilities in furtherance of their major capital projects while noting: "[i]t is well established that, absent express legislative authority, the PUC is powerless to interfere with the general management decisions of public utility companies." *Id.* at , 460 A.2d at 737.

The issue then, as we stated at the outset, is whether the Code empowers the Commission to require the refund of monies collected pursuant to an approved Gas Cost Rate although no greater amounts were thereby collected than actually necessary to pay for the gas provided to customers and although the charges conformed to the applicable tariff and statutory and regulatory law and although the contracting gas supplier was not affiliated with the utility and although the utility received in the whole of its revenues during the refund period no more than a fair return on the fair value of its property. The ALJ decided that the Commission had no power to order refunds under such circumstances. The Commission, by its decision, implicitly asserts the existence in the Code of the power to here order refunds but fails to reveal the origin of the power.

We decline now to finally decide this issue as a decision at this time is unnecessary. We have already discussed the rationale for our decision to remand this matter for a more thorough revelation of the facts of record which, in the Commission's view, support the conclusion that NFG's management abused its discretion in continuing to purchase the Ashland SNG. Should the Commission remain of the opinion that the record supports the charge of managerial dereliction and that this finding, in turn, is sufficient to support a refund order, we enjoin it then to address the issue of the source of its power to require refunds under the factual circumstances as the Commission finds them to have been.

## II. The Off-System Sales

· NFG also seeks review of that portion of the Commission's August 28, 1980, order which requires the utility to:

submit to the Commission a proposal or proposals . . . which will accomplish a refund to ratepayers. . . [of] 80% of the profits, after taxes, from off-system sales for the 12 month period ending August 31, 1980, in excess of the 1.4 BCF of sales included in base rates.

The off-system sales referred to involve gas purchased from NFG by entities unconnected to NFG's gas lines. The purchasers are not regular customers of NFG, the transactions are generally unregulated by state public utility commissions, and the sales, although frequent, are made on a one-time, emergency basis. The gas sold off-system is fuel committed to NFG by its suppliers which NFG, due to the transient exigencies of weather, customer demand, and unused storage capacity, cannot, at the time of agreed delivery, use.

NFG excepted on a number of grounds to the Administrative Law Judge's recommendation, accepted by the Commission, that 80% of the margin on off-system sales during the twelve month period ending August 31, 1980, be refunded to ratepayers. The utility argued to the Commission that the matter of the disposition of revenues from off-system sales was without the Pennsylvania Public Utility Commission's jurisdiction as having been preempted by the federal regulatory authority. This contention seems now to have been abandoned.

NFG first renews on the occasion of this appeal the contention that the Commission has not here made the factual findings required in the case of ordered refunds by Section 1312 of the Code, 66 Pa. C. S. §1312. NFG also argues that the refund order violates the doctrine of commission made rates but our disposition of the first contention makes it unnecessary for us to decide this issue.

As we discussed above (Section I. B(3)) Code Section 1312 authorizes refunds only when the record will support a finding that the utility's *rates* during the refund period were unlawful or in violation of the utility's tariff or unjust or unreasonable, that is, productive of revenues unreasonably advantageous to the utility's owners as in excess of a fair return on the fair value of the utility's property used in providing the public service. It is here conceded that NFG's off-system sales were lawful and, indeed, that an allowance for revenues produced by such sales was made in the base rates last approved by the Commission. There is no finding in the decision of the Commission now subject to review that NFG's rates during the twelve-month period prior to August 31, 1980,[13] were unjust or unreasonable.

Nevertheless, the Commission's legal staff now asserts that no refund of profits from off-system sales were here ordered and that the record compels the conclusion, implicit in the Commission's decision, that the amount of the profits received by NFG during the refund period was unreasonable.[14] We cannot agree with either assertion.

The legal staff first argues that with respect to NFG's revenues from off-system sales, the Commission here ordered "basically a *credit* for overcollection (emphasis in the original)" and did not order refunds within the limitations of Code Section 1312. This construction flies in the face of the order itself which describes the proposal which NFG is thereby required to submit as one "which will accomplish a refund to ratepayers. . . ." Moreover, in our judgment the analysis proposed by the legal staff con-

---

[13] The Commission's order was entered on August 28, 1980.

[14] The OCA has not briefed the issues raised by NFG with respect to the off-stystem sales.

fuses the relief ordered by the Commission with the nature of the mechanism required to be employed to effect that relief. Profits from off-system sales are simply one of many sources of revenue to the regulated utility. When the Commission orders the retroactive return of revenues to consumers, whether by disbursement or by a credit on future customer bills, it has ordered a refund. Section 1307(e) of the Code, 66 Pa. C. S. §1307(e) so recognizes by describing as refunds the return to ratepayers of excess revenues collected pursuant to a utility's GCR although the mechanism of refund is by means of a prospective billing credit.

The Commission's brief also contains the following alternative argument with respect to the propriety of the ordered refund of the off-system sales profits:

However, if the Court accepts the refund analysis, the Commission also argues that the "refund" does meet the requirements of 66 Pa. C. S. §1312, relating to refunds. Clearly, if the refund analysis is accepted, the rates which did not reflect the very high level of off-system sales profits, and which at the same time included the very high prices for Ashland SNG, were unjust and unreasonable. Therefore, the underpinning for a refund required by Section 1312 exists. There is substantial record evidence to support this conclusion.

No particular "substantial record evidence" is described or its location in the record supplied.

The reference to a high level of off-system sales may refer to the inclusion in NFG's base rates in force prior to the utility's November 29, 1979, tariff filing of anticipated revenues from 1.4 BCF of off-system sales. NFG's actual off-system sales during the refund period were about 18 BCF. Thus, it may

well be, as the Commission's legal staff now obliquely suggests in its brief, that the additional revenues from off-system sales during the refund period resulted in the utility's collection from customers of more than a fair return on the value of its useful property. Indeed, assuming the adequacy of the rates previously in force, this consequence of substantial unanticipated revenues without attendant cost to the utility would seem inescapable unless, as is not here asserted, during the same period NFG encountered equally substantial and unanticipated expenses or liabilities. To put the point another way, this record may support a finding, made expressly necessary by Code Section 1312, that NFG's rates during the twelve month period prior to August 31, 1980, produced revenues, including revenues from off-system sales, in an amount unreasonably advantageous to the utility's investors. But the Commission made no such finding and, of course,

> [t]he arguments advanced in the Brief of the Commission legal staff are no substitute for adequate findings of fact. . . .

*Metropolitan Edison Company v. Pennsylvania Public Utility Commission,* 62 Pa. Commonwealth Ct. at 477 n. 9, 437 A.2d at 84 n. 9.

In conclusion, in the absence of a finding that NFG's rates during the refund period were unjust or unreasonable, the Commission has here erred with respect to an item of NFG's revenues in the same way in which it appears to have erred with respect to NFG's Ashland SNG expense. If a utility's rates are, as in this case, lawful and in conformance with the applicable tariff, Code Section 1312 authorizes retroactive rate relief in the form of a refund only if the utility's rates are unreasonable or unjust. So far as we are able to discern, there is no warrant in Section 1312

for a line-by-line examination of the utility's expenses and revenues actually incurred or received under rates previously in force and the Code does not authorize the imposition of a refund of excess revenues and improvident expenditures without consideration of the reasonableness and justice of the rates as a whole. This is not to say that the legislature could not authorize refunds on such a basis but that it has not done so.

The Legislature's failure to authorize refunds in case an item of the utility's revenue is greater than anticipated at the time of tariff approval or an item of expense is or should have been less than anticipated and approved, is sensible and equitable. It is equitable because the utility may not receive retroactive rate relief on account of expense items which are greater than anticipated or of revenue items which are lesser. It is sensible because the consideration of expense and revenue items in isolation and the requirement of refunds based only on such narrow consideration could result in the setting of confiscatory rates.

III. Effective Date of the Commission's Order Approving in Part NFG's November 29, 1979, Proposed Filing

As we have indicated, on November 29, 1980, NFG filed a revised tariff seeking a general rate increase proposing about $21 million in additional annual revenues. The Commission suspended the proposed rates pursuant to Section 1308 of the Code, 66 Pa. C. S. §1308; conducted an investigation and, on August 28, 1980, disapproved the requested increase as proposed but permitted NFG to file new tariffs or tariff supplements designed to produce an increase in annual revenues of about $8 million, the rates therein described to be effective on thirty days' notice of filing. August 28, 1980, was the last day of the seven-month

suspension period authorized by Code Section 1308(d) and NFG now argues that the effect of the Commission's action approving the increase in part but delaying the effective date of the approved rates, is to unlawfully extend the suspension period.

The issues presented by this facet of NFG's appeal appear to be controlled by our recent opinion in the case of *Bell Telephone Company v. Pennsylvania Public Utility Commission*, 69 Pa. Commonwealth Ct. 554, 452 A.2d 86 (1982), *allocatur granted*, March 16, 1983, where we held that the effective date of compliance tariffs ordered to be filed on the last day of the suspension period must be that last day of the suspension if the Commission's order is to be, as it is required to be, final. None of the parties to these appeals have briefed the effect of our *Bell Telephone* opinion and, inasmuch as the Supreme Court has accepted allocatur in that case, we may not now reexamine the correctness of our resolution of the issues there presented. Therefore, we will remand this matter to the Commission for further proceedings, including a reexamination of the effective date of NFG's increased rates in the light of *Bell Telephone Company v. Pennsylvania Public Utility Commission*.

## IV. Conclusion

This case presents complex issues of law and fact. Being ourselves required to review more matters than we comfortably are able, we can understand the Commission's inability fully to explain every decision it is called upon to make in every rate case. Perhaps the Commission's determinations should be in some respects final. However, general judicial review is now required and we are constrained to reverse and remand decisions the bases for which are insufficiently described and to set aside those decisions for which sufficient findings of fact have not been made.

ORDER

AND NOW, this 4th day of August, 1983

(1) The Orders of the Pennsylvania Public Utility Commission adopted August 28, 1980, and December 18, 1981, the subjects of the appeals to 2255 C.D. 1980 and to 11 C.D. 1982 are reversed and the records are remanded for further proceedings consistent with this opinion, including, if appropriate, findings of facts on the issue of Petitioner, National Fuel Gas Distribution Corporation's abuse of its managerial discretion in the purchase of Ashland Synthetic Natural Gas during the period from September, 1979, through February, 1980, and, if appropriate, for conclusions as to the basis in the Pennsylvania Public Utility Code of the power of the Commission to require a refund under the circumstances as found.

(2) The Order of the Pennsylvania Public Utility Commission entered and adopted August 28, 1980, and made the subject of the appeal docketed to 2255 C.D. 1980, is reversed insofar as it requires the Petitioner, National Fuel Gas Distribution Corporation to refund or to submit a proposal for the refund of profits from off-system gas sales during the twelve-month period ending August 31, 1980.

(3) The Orders of the Pennsylvania Public Utility Commission entered August 28, 1980, September 4, 1980, and October 20, 1980, the subject of the appeals docketed to 2255 C.D. 1980, 2294 C.D. 1980, and 2472 C.D. 1980, respectively, are reversed and the records remanded for further proceedings as to the effective date of Petitioner, National Fuel Gas Distribution Corporation's general rate increase made the subject of its Supplement No. 19 to Tariff Gas-Pa. P.U.C. No. 4 filed with the Commission on November 29, 1979, consistent with this opinion and with our holding in the case of *Bell Telephone Company v. Pennsylvania Public Utility Commission*, 69 Pa. Commonwealth Ct.

554, 452 A.2d 86 (1982) *allocatur granted* March 22, 1983.

(4) In all other respects the Orders of the Pennsylvania Public Utility Commission, the subject of these consolidated appeals, are affirmed.