The Bell Telephone Company of Pennsylvania, Petitioner v. Pennsylvania Public Utility Commission, Respondent.

Business Users' Group and Westinghouse Electric Corporation et al., Intervenors.

Argued September 13, 1982, before Judges ROGERS, WILLIAMS, JR., and CRAIG, sitting as a panel of three.

*Irving R. Segal*, with him, *Gerard J. St. John, Schnader, Harrison, Segal & Lewis, Judith N. Dean, John P. Fons, and Raymond F. Scully*, for petitioner.

*Bohdan R. Pankiw*, Assistant Counsel, with him, *Steven A. McClaren*, Deputy Chief Counsel, and *Joseph J. Malatesta, Jr.*, Chief Counsel, for respondent.

*Daniel Clearfield*, Assistant Consumer Advocate, with him, *Andrew M. Hermann*, Legal Assistant, and *Walter W. Cohen*, Consumer Advocate, for intervenor, Consumer Advocate of Pennsylvania.

*Selma A. Aloff*, with her *Jack J. Aloff*, for intervenors.

OPINION BY JUDGE ROGERS, November 5, 1982:

We are required by this appeal to decide whether the Pennsylvania Public Utility Commission may law-

fully, after making a final order and decision granting in part a general rate increase and ordering the filing of revised tariffs, suspend the effective date for the application of the revised tariffs to the date of filing of the revised tariffs when that date is more than nine months after the filing for the general rate increase. The issue seems not to have been previously addressed by Pennsylvania Courts. The decision requires us to construe Section 1308(d) of the Public Utility Code, 66 Pa. C. S. §1308(d), which is pertinently as follows:

General rate increases.—Whenever there is filed with the commission by any public utility . . . any tariff stating a new rate which constitutes a general rate increase, the commission shall promptly enter into an investigation and analysis of said tariff filing and may by order setting forth its reasons therefor, upon complaint or upon its own motion, upon reasonable notice, enter upon a hearing concerning the lawfulness of such rate, and the commission may, at any time by vote of a majority of the members of the commission serving in accordance with law, permit such tariff to become effective, except that absent such order such tariff shall be suspended for a period not to exceed seven months from the time such rate would otherwise become effective. Before the expiration of such seven-month period a majority of the members of the commission serving in accordance with law, acting unanimously, shall make a final decision and order, setting forth its reasons therefor, granting or denying, in whole or in part, the general rate increase requested. If, however, such an order has not been made at the expiration of such seven-month period, the proposed general rate increase shall go into effect at the end of such period, but the com-

mission may by order require the interested public utility to refund, in accordance with section 1312 (relating to refunds), to the persons in whose behalf such amounts were paid, such portion of such increased rates as by its decision shall be found not justified, plus interest, . . . . The rate in force when the tariff stating such new rate was filed shall continue in force during the period of suspension unless the commission shall grant extraordinary rate relief as prescribed in subsection (e). The commission shall consider the effect of such suspension in finally determining and prescribing the rates to be thereafter charged and collected by such public utility except that the commission shall have no authority to prescribe, determine or fix, at any time, during the pendency of a general rate increase proceeding or prior to a final determination of a general rate increase request, temporary rates as provided in section 1310, which rates may provide retroactive increases through recoupment. As used in this part general rate increase means a tariff filing which affects more than 5% of the customers and amounts to in excess of 3% of the total gross annual intrastate operating revenues of the public utility.

The pertinent facts are undisputed. On July 25, 1980, Bell Telephone filed with the Commission revised tariffs designed to increase its annual operating revenues by approximately $237 million. These revised tariffs were intended by Bell to become effective sixty days after their filing, that is, on September 23, 1980. On September 18, 1980, the Commission ordered an investigation concerning the proposed tariffs and the proposed tariffs were thereafter suspended for the maximum period permitted by Section 1308(d) of

seven months and sixty days from the date of their filing, (plus an additional day to which Bell acquiesced) until April 24, 1981, on which date the Commission entered an order detailing its response to each of Bell's proposed tariff revisions and denying Bell's proposal as filed, allowing an increase in annual operating revenues of $150 million and ordering Bell to file new tariffs or tariff supplements based on the amount of increase allowed. The April 24, 1981, order further provided as follows:

3. That The Bell Telephone Company of Pennsylvania shall file information on curtailment and expenses associated with implementation of the rates authorized herein, as directed in the body of this Order.

4. That tariffs or tariff supplements may be filed upon less than statutory notice, and pursuant to the provisions of 52 Pa. Code §3.-321(b), the tariffs or supplements may be filed *to become effective for service rendered on or after April 24, 1981.*

5. That The Bell Telephone Company of Pennsylvania shall file detailed calculations, at such time as it shall file revised tariffs or supplements, demonstrating that the rates therein contained are made in compliance with the provisions of this Order. (Emphasis supplied.)

Bell's new tariff filings, required by the April 24, 1981, order and denoninated by the parties as compliance tariffs, were made twenty-one days later, on May 15, 1981. On June 5, 1981, the Commission entered an order approving the compliance tariffs in part and ordering Bell to file new revised compliance tariffs to become effective as of May 15, 1981, rather than on April 24, 1981, the day after the seven months within which the Commission was required to file a

final order if the originally filed tariffs were not to become effective.[1]

Bell has petitioned this Court for review of the Commission's June 5, 1981, order insofar as it has the effect of denying to Bell until May 15, 1981, the $150 million increase in operating revenues granted by the Commission on April 24, 1981. Bell asserts that this additional twenty-one day delay in its receipt of needed rate relief, causing it to lose more than $7 million in revenues, is prohibited by Section 1308(d) above quoted.

The Commission and the respondent intervenors argue that the strictures of Section 1308(d), including the maximum seven-month suspension period, apply only to a utility company's initial general rate increase filing and do not apply to compliance tariffs, required to be filed by the company in those cases where the Commission grants the proposed general rate increase in part. In addition, respondents contend that application of the rates set forth in the compliance tariffs to customer services rendered before May 15, 1981, would constitute a "retroactive rate increase" prohibited by Section 1303 of the Code which provides:

Adherence to tariffs.

No public utility shall, directly or indirectly, by any device whatsoever, or in anywise, demand or receive from any person, corporation, or municipal corporation a greater or less rate

---

[1] The Commission's Trial Staff petitioned for reconsideration of the June 5, 1981, Order contending that the twenty-one day delay in the receipt by Bell of needed rate relief accomplished by the Order exceeded by the maximum lawful suspension period of Section 1308 (d), violated the terms of paragraph four of the April 24, 1981, Order, effected a shortfall in Bell's approved revenue increase, and, in any event, was unlawfully made without sufficient prior notice to the utility. This Petition was denied by the Commission.

for any service rendered or to be rendered by such public utility than that specified in the tariffs of such public utility applicable thereto. The rates specified in such tariffs shall be the lawful rates of such public utility until changed, as provided in this part. Any public utility, having more than one rate applicable to service rendered to a patron, shall, after notice of service conditions, compute bills under the rate advantageous to the patron.

We first reject the respondents' second argument. We have no quarrel with the general propositions that ratemaking is prospective in nature and that a public utility may charge for its services no rate other than that contained in the applicable tariff. However, neither Section 1303 nor Section 1302, also relied on by the respondents and requiring tariffs to be "open to public inspection," prohibit the Commission from ordering the application of a schedule of rates, based on a rate increase approved by it, to services rendered after the date of the order approving the increase. Indeed, to the extent that any retroactivity is inherent in such an application of a new schedule of rates, no authority brought to our attention prohibits the Commission, as opposed to the utility company, from ordering retroactive rate relief and we note that Section 1310 of the Code, having to do with temporary rates, and particularly subsection(e) of that section creates a necessarily retroactive ratemaking mechanism by requiring the Commission to consider the effect of inadequate rates set on a temporary basis when fixing the amount of permanent rates thereafter approved.[2]

---

[2] On this point, Section 1310(e) was even more explicit preceding its amendment in 1976. As originally enacted, the final sentence of the subsection was as follows:

Moreover, the order of the Commission here challenged, the propriety of which is sought to be buttressed by reference to the evils of retroactive ratemaking, itself embodies such retroactivity. As we have indicated, the Commission's April 24, 1981, order required Bell to file the compliance tariffs submitted on May 15, 1981. Thereafter, on June 5, 1981, the Commission approved in part the May 15, 1981, filings; ordered, as to $10 million of the $150 million increase therein proposed that revised compliance tariffs be subsequently filed; and ordered that the whole of the increased rates, including those to be contained in the required future filings, be effective as of May 15, 1981. In the light of this aspect of the Commission's June 5, 1981, order in this case, its protestations that it has no power to accomplish retroactive ratemaking appear to be inherently inconsistent.

The parties' central dispute concerns the meaning of Section 1308(d). In our view the critical language of this provision is the following:

> Before the expiration of such seven-month period, a majority of the members of the commission ... shall make a final decision and order ... granting or denying, in whole or in part, the general rate increase requested. If, however, such an order has not been made at the expiration of such seven-month period, the proposed general rate increase shall go into effect . . . .

(e) . . . If, upon final disposition of the issues involved in such proceeding, the rates as finally determined, are in excess of the rates prescribed in such temporary order, then such public utility shall be permitted to amortize and recover, by means of a temporary increase over and above the rates finally determined, such sum as shall represent the difference between the gross income obtained from the rates prescribed in such temporary order was in effect.
Act of May 28, 1937, P. L. 1053, art. III, §310, 66 P.S. §1150(e).

The rate in force when the tariff stating the new rate was filed shall continue in force during the period of suspension. . . .

From these statutory imperatives several corollaries are derived which underscore the impropriety of the Commission's order here challenged. The requested general rate increase may be suspended for no more than seven months after the sixty day initial period for Commission review. Before the close of the suspension period, to avoid the automatic implementation of the proposed increase, the Commission must issue a *final* order in the matter. The rates in force during the suspension period are those contained in the tariff last approved; but at the end of the suspension period, in the absence of a final order of the Commission, the proposed increase takes effect.

In the instant case, the Commission's order issued on the day after the last day of the suspension period is asserted to be the final order required by the Code in order to prevent the effectuation of Bell's rate request and, inconsistently, is asserted to have accomplished no final determination with respect to the $150 million rate increase thereby found to be necessary to Bell's continued economic well-being. This interpretation of the order, apart from its inconsistency, flies in the face of its fourth paragraph which expressly provides that the compliance tariffs to be filed by Bell shall be "effective for service rendered on or after April 24, 1981."[3]

---

[3] We reject the contention that this portion of the order should be read to permit an April 24, 1981 effective date only if the compliance tariffs were filed on that date, i.e. on the same day they were first ordered to be filed by the Commission. Not only does the ordering paragraph contain no such condition, the fifth paragraph of the April 24, 1981, order requires Bell to file, simultaneously with the compliance tariffs, detailed supporting calculations and accompanying explanatory materials. These accompanying materials,

Thus distinguishable are those authorities of other jurisdictions, interpreting the provisions of the utility codes of those jurisdictions, which have upheld delays beyond the permissible suspension period based on the requirement that the utility file compliance tariffs. *See Lambertville Water Co. v. New Jersey Board of Public Utility Commissioners*, 79 N.J. 449, 401 A.2d 211 (1979); *Mechanic Falls Water Co. v. Maine Public Utilities Commission*, 381 A.2d 1080 (Me. 1977). The statutes construed in these cases did not require the regulatory agency to issue a final order before the end of the suspension period. Indeed, in the *Mechanic Falls Water Co.* case the Maine Supreme Court held that the order at issue was not final because it envisioned later filings by the utility and further action by that state's public utility commission. If the precepts of this authority, to which the respondents and intervenors make repeated reference in bowdlerized form, were adopted as a whole in the instant case we would be constrained to hold that the Commission's April 24, 1981, order was not final and that Bell's proposed tariffs based on $237 million in increased revenues thereupon became effective.[4]

The Commission's interpretation of the April 24, 1981, order also ignores that portion of its fourth paragraph providing that the compliance tariffs be

we are told, encompass two lengthy volumes in Bell's May 15, 1981, submission. In the total absence of textual support we will not assume that the Commission envisioned that these lengthy materials would be assembled, reproduced, and submitted the day it first requested them.

[4] Also we are critically unfamiliar with the regulatory practices of the commissions of these states in general rate cases and do not know whether those commissions require simultaneous filing of detailed supporting data at the time of submission of the compliance tariffs. Application in this instance of the principles announced in the rate cases of other jurisdictions predicated on the provisions of their codes would be a path fraught with peril and one on which we, therefore, decline to embark.

filed "pursuant to the provisions of 52 Pa. Code §3.-321(b) . . ." having to do with "rates prescribed by the Commission." In fact, the familiar practice of the Commission has been to approve the rate increase requests of utilities as to amount and then to leave to the utility the laborious and mechanical task of allocating the approved increase among the various classes of consumers.[5] This procedure relieves the Commission of the task of itself translating the ordered increase into new tariffs as is authorized by Sections 1308(c) and 1309 of the Code. Delegation of this translational task to the utility, however, cannot alter the effect of the Commission's accompanying determination that, as of the date of the order approving the increase, the existing revenues are insufficient and, therefore, unconstitutionally confiscatory. In short there is no warrant in the Code for delay in the receipt of rate relief following the Commission's determination in the instant case that as of April 24, 1981, Bell's existing rates fell short of that which is just and reasonable by some $150 million.

---

[5] Counsel for the Commission expressed inability to describe the Commission's past practice with respect to the effective date of rate increases the terms of which are set forth in compliance tariffs filed after the end of the suspension period. Bell asserts that these compliance tariffs have always been permitted to control the rates applicable to services rendered after the date of the earlier order granting as to amount the proposed increase. Bell's view appears to be accurate. *See e.g. Pennsylvania Public Utility Commission v. Pennsylvania Gas and Water Company,* 19 Pa. Commonwealth Ct. 214, 234, 341 A.2d 239, 251-252 (1974).

Our resolution of the other issues in this case makes it unnecessary to consider Bell's substantial argument that it was denied procedural due process by the failure of the Commission to give any indication in its April 24, 1981 order that the approved increase in annual revenues would not be effective until the compliance tariff's were filed. Bell asserts with some force that, had it known this, it might have been able, through allocation of additional resources to the project, to file the compliance tariffs sooner.

A delay, during the period of the utility's production of compliance tariffs and required supportive material, in the receipt of increased revenues found to be necessary would also appear to violate that portion of Section 1308(d) of the Code requiring that the Commission consider the effect of the period of suspension in finally prescribing the rates to be charged. Of course, the Commission cannot have considered the effect of a period of suspension, the length of which was unknown at the time the rates were "finally prescribed." The Commission's determination that Bell needed $150 million in additional revenues was without consideration of the additional twenty-one days of suspension later attempted to be accomplished by the June 5, 1981, order now subject to review. As we have indicated, Bell asserts that the additional delay results in a $7 million shortfall in anticipated and needed revenues.

Finally, we are unpersuaded by the contention of the Consumer Advocate that some unfairness to the ratepayers results from application of the terms of the compliance tariffs to services rendered between the approval of the rate increase on April 24, 1981, and the initial date of filing of the compliance tariffs on May 15, 1981. Bell's $237 million increase proposal was filed with the Commission and thereafter available to the public on July 25, 1980. The terms of this tariff were to become effective by operation of law, in the absence of a final order of the Commission, on April 23, 1981. The prejudice to consumers of the considerably smaller increase effective April 24, 1981, is not apparent. Moreover, in this aspect of this general rate case the Consumer Advocate hypothecates ratepayer dissatisfaction, not with the amount of the general increase, but with the distribution of its burden —an issue concerning which those dissatisfied may obtain complete review pursuant to Section 1304 of the Code.

Accordingly we enter the following.

ORDER

AND Now, this 5th day of November, 1982 the order of the Pennsylvania Public Utility Commission entered June 5, 1981, is modified to provide that the rates therein approved shall be effective for service rendered on or after April 24, 1981, and, as so modified, is affirmed.