Walter W. Cohen, Consumer Advocate, Petitioner v. Pennsylvania Public Utility Commission, Respondent. UGI Corporation—Gas Utility Division, Intervenor.

UGI Corporation—Gas Utility Division, Petitioner v. Pennsylvania Public Utility Commission, Respondent. Bethlehem Steel Corporation et al., Intervenors.

UGI Corporation—Gas Utility Division, Petitioner v. Pennsylvania Public Utility Commission, Respondent. Office of Consumer Advocate et al., Intervenors.

Argued September 13, 1983, before President Judge CRUMLISH, JR. and Judges ROGERS, WILLIAMS, JR., CRAIG, MACPHAIL, DOYLE and BARRY.

*Philip F. McClelland,* Assistant Consumer Advocate, with him *H. Kay Dailey,* Assistant Consumer Advocate and *David M. Barasch,* Acting Consumer Advocate, for petitioner/intervenor.

*Frank B. Wilmarth,* Assistant Counsel, with him *Charles F. Hoffman,* Chief Counsel, and *Albert W. Johnson, III,* Deputy Chief Counsel, for respondent.

*Kenneth R. Myers,* with him *Larry R. Chatzkel* and *Michael G. Nearing, Morgan, Lewis & Bockius,* and of counsel: *Walter F. X. Healy* and *William N. Farran, III,* for intervenor/petitioner.

OPINION BY JUDGE CRAIG, November 29, 1983:

UGI Corporation—Gas Utility Division (UGI) has appealed from Pennsylvania Public Utility Commission orders of December 22, 1982 and January 7, 1983. The first of these orders allowed UGI a gas rate increase totaling $21,290,543, instead of the $30,719,803 which UGI had sought by its Supplement No. 3 filing, using 1982 as test year. From that order, the Office of Consumer Advocate (OCA) has appealed, pursuing a different issue, discussed below. The second order, appealed only by UGI, embodied the commission's acceptance of UGI's second version of a tariff to comply with the first order.

In the rate increase filing, UGI had also proposed a new Rate FS (Flexible Service) for large interruptible customers with the capacity to burn either gas or oil, customers previously served under Rate S (Seasonal). UGI has stressed the need to retain such customers in the face of competition from low cost No. 6 high sulphur residual fuel. During the proceedings UGI modified its sales projections downward, contending that lowered oil prices would mean that not even the reduced gas rate would prevent a loss of sales to customers capable of using oil as an alternative.

However, in the December 22 order, the PUC found that gas sales would increase, not decline, to 66.9 bcf (billion cubic feet), as the utility itself had originally estimated for the test year. The PUC approved rate FS but required that rate FS be made available to non-interruptible customers on Rate LF (Load Factor).

The PUC thereafter disapproved UGI's original compliance filing, which UGI claims would have provided the increase allowed by the commission. The finally-approved compliance filing, UGI contends, will yield $3,640,115 less revenue than was approved. The PUC and this court both have denied UGI's request to stay the commission's January 7 order.

The questions in general are whether the commission erred in (1) refusing to accept UGI's projections of a decline in gas sales levels, (2) refusing to recognize the revenue deficiency which, UGI contends, would result from the implementation of Rate FS, and (3) extending the reduced Rate FS to firm customers.

### UGI Appeal—Gas Sales Projections

In this case an important background factor is the federal government's Natural Gas Policy Act, 15 USC §3301 et seq., mandating the gradual decontrol of natural gas prices. UGI's case is that gas prices have

risen above the market price for oil, when compared on an equivalent energy basis.

The guiding principle, that the PUC must allow just and reasonable rates, means that a public utility is entitled to recover necessary operating expenses while earning a fair return on the investment in plant used and useful in providing the service. *City of Pittsburgh v. Pennsylvania Public Utility Commission*, 42 Pa. Commonwealth Ct. 242, 247, 400 A.2d 672, 674 (1979). Obviously, the regulatory agency must allow the utility a fair opportunity to implement the lawful return.

Rate setting is a process which necessarily involves valuation of economic elements in the future tense. Because "rates must be fixed for the future as well as for the present," such future "estimates . . . must necessarily enter into the disposition of any rate case." *Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission*, 141 Pa. Superior Ct. 5, 17, 14 A.2d 133, 138 (1940).

UGI's filing, in its original terms, predicted 66.9 bcf of sales. UGI witness Chaney considered that up to 9 bcf of sales could possibly be lost by customers switching to fuel oil—that concern being the basis for the Rate FS proposal. With an estimate that 9 bcf of load could transfer to the flexible rate, the witness estimated that 7.2 bcf out of the 9 bcf could be preserved, thus initially predicting a loss of about 2 bcf, which would reduce projected total sales to 64.9 bcf. Later in the hearings, UGI offered new estimates, claiming decreasing oil prices as a basis, in the spring of 1982, for foreseeing a further drop to 59.9 bcf. In even later testimony, UGI then submitted a new sales estimate at 56.9 bcf. However, upon cross-examination, UGI's initial witness acknowledged that, by mid-1982, all but one of the earlier-switching customers had switched back to gas use.

UGI's testimony particularly stressed the sales loss impact which could accrue from the gas cost rate (GCR) automatically incorporated as a result of increased prices of gas to UGI, originally estimated to be $1.48 per mcf; however, the actual GCR increase was $.91.

Understandably, UGI witnesses differed in their estimates of the extent of load loss, with drops of 7 bcf and 10 bcf being variously predicted. UGI's sales projections did not go unchallenged. A PUC staff witness pointed to company actions reflecting optimism rather than pessimism, and a witness for the Office of Consumer Advocate testified in support of UGI's original projections, which contrasted with the utility's subsequent downward revisions.

UGI's contention is that the PUC erred as a matter of law in refusing to consider the projections of decline. However, the PUC order does not provide any foundation for such an issue. The commission, as the administrative law judge had done, considered and weighed the evidence relating to loss of sales, finally finding that such loss remained highly speculative and incapable of accurate quantification. Stressing the volatility of oil and gas price relationships, the order noted the return of customers who had earlier switched to oil. The PUC also noted the fact, mentioned above, that the GCR increase resulted in a substantially smaller evaluation of gas prices than initially expected.

Although the PUC order commented upon the absence of any showing that UGI had "acted prudently," noting that "UGI may be lax" in keeping the price of gas as low as possible, and also ruminated about the appropriateness of considering plant attributable to a loss customer to be still used and useful as to remaining customers, such dicta were not determinative.

The determinative issue with respect to sales projections is whether or not the PUC's findings on the point, in relation to conflicting evidence, were based upon substantial evidence. 2 Pa. C. S. §704. *Big Run Telephone Co. v. Pennsylvania Public Utility Commission,* 68 Pa. Commonwealth Ct. 296, 449 A.2d 86 (1982). With UGI having the burden of proof, 66 Pa. C. S. §315(a), as to all factors affecting proposed rates, *Lower Frederick Township Water Co. v. Pennsylvania Public Utility Commission,* 48 Pa. Commonwealth Ct. 222, 409 A.2d 505 (1980), we conclude that, on this record of testimony and exhibits, the PUC was entitled to weigh the evidence and reject the company's projections as insufficiently convincing. Although there is "a very definite forward-looking aspect in the ratemaking process," *City of Pittsburgh,* 42 Pa. Commonwealth Ct. at 245, 400 A.2d at 674, the commission was entitled to regard oil and gas price volatility as a situation calling for normalizing adjustments, *Pittsburgh v. Pennsylvania Public Utility Commission,* 187 Pa. Superior Ct. 341, 361, 144 A.2d 648, 659 (1958).

The commission was entitled to give weight to UGI's own rising sales projections for 1983 to 1987 (405a) and was also entitled to take note of UGI's support of the application submitted to the Federal Energy Regulatory Commission by Columbia Gas Transmission Corporation, requesting an *increase* of the total daily gas entitlement of UGI.

The PUC order expressly found that the record did not support any finding that load switching would be a normal phenomenon in the future.

Also affecting the credibility of UGI's presentation was the point, as the order notes, that UGI stressed evidence of future loss of sales "without making a concomitant downward adjustment to attendant expenses. . . ."

We conclude that the PUC's findings with respect to prospective sales load for the test year were based upon adequate analysis and substantial evidence.

### UGI Appeal—Non-Recognition of Alleged Revenue Shortfall, in Tariff Implementation

The second major question has arisen in connection with UGI's submission of proposed tariffs, after the December 22, 1982 PUC order, to implement the allowed revenue increase of $21,290,543. The PUC rejected UGI's compliance filing of December 28, 1982 because it involved rates adjusted to reflect the alleged sales loss which the PUC had rejected as speculative in its order of December 22. After UGI, under protest, responded with the December 30 compliance filing, Revised Supplement 9, it received approval by the commission's final order of January 7, 1983 on the ground that it reflected the commission's sales level conclusion, 66.9 bcf, and the original revenue estimates.

UGI argues that, even with the commission's assumption, in its December 22 order, that Rate FS, at 50 cents per mcf below Rate S, could preserve the full interruptible load, the PUC refused to recognize, thereby, the nonexistence of revenue in the amount of $3.6 million.

However, as UGI's brief acknowledges, the PUC refused to recognize revenue losses resulting from the availability of Rate FS for the same reasons it refused to recognize UGI's projected decline in total sales. By the same token, in pressing this second issue, UGI is essentially renewing its attack upon the PUC's sales loss rejection considered as the first issue above.

Although the PUC's December 22 order undoubtedly gave UGI a right to collect the revenue thereby allowed, 66 Pa. C. S. §316, judgment as to the propriety of a tariff which would comply with that reve-

nue determination order necessarily involved the assumption of certain premises which necessarily are also embodied in the December 22 order. Although *Cheltenham & Abington Sewerage Co. v. Pennsylvania Public Utility Commission,* 344 Pa. 366, 25 A.2d 334 (1942), cited by UGI, does hold that rates fixed by a tariff, when approved by the commission as being in compliance with a revenue determination, are indeed commission-made rates, there is nothing in that opinion of the Supreme Court which suggests that the commission, after allowing a revenue increase, must yield its authority and defer to the utility's sales assumptions in devising the compliance tariff.

UGI, in citing *Cheltenham* and also *Bell Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Commission,* 69 Pa. Commonwealth Ct. 554, 452 A.2d 86 (1982), for the proposition that the tariff filing is a matter of procedure, is correct; the tariff, in order to receive approval as being in compliance, must follow the parameters—the assumptions or conclusions as to constants or determinative characteristics — adopted in the PUC order which made the revenue determination.

The essentially experimental nature of Rate FS is not to be forgotten. Nor do we reject recognition of the principle that regulation does not insure that the business shall produce net revenues. *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 603 (1944), *Federal Power Commission v. Natural Gas Pipeline Co.,* 315 U.S. 575, 590 (1942). The commission's final order recognized that, if any load switching occurs, Rate FS could be redesigned to permit the company an opportunity to recoup any resultant under-recovery of fixed costs.

UGI's supplemental argument on this issue, that the PUC deprived the utility of procedural due process in that the commission's decisions upon the com-

pliance filings effected a redetermination of the revenues allowed in the December 22 order, is founded more upon the semantics of its articulation than upon any substantial constitutional basis. As noted, the validity of the compliance filing decision turns upon the same sales prediction factors as were resolved in the revenue determination, and UGI does not claim that it lacked any notice or opportunity for hearing on the factual matter of whether or not technical and market forces might produce sales losses.

*UGI Appeal—Extension of Flexible Rate to Firm Customers*

A due process claim of greater moment is embodied in the issue which UGI has raised concerning the PUC's order that Rate FS be made available, not only to the interruptible customers to whom Rate S was available, but also to some of the firm customers under Rate LF, subject to existing contractual arrangements between those latter customers and the utility. There is no doubt that procedural due process standards are applicable to PUC proceedings. *Smith v. Pennsylvania Public Utility Commission,* 192 Pa. Superior Ct. 424, 162 A.2d 80 (1960); *Re: Shenandoah Suburban Bus Lines,* 158 Pa. Superior Ct. 638, 46 A.2d 26 (1946), *aff'd,* 355 Pa. 521, 50 A.2d 301 (1947).

UGI stresses the fact that it was not until a public meeting on September 17, 1982, after the hearings before the ALJ had concluded four days earlier, that the PUC asked the ALJ to consider the propriety of extending the flexible rate to firm service customers. UGI has contended that it thus had no opportunity to present evidence in opposition to the proposal; in seeking a stay from this court, UGI averred by affidavit that, given the opportunity, it would have presented in evidence specific statistical information concerning the number and load of firm customers with alternate fuel capability, the fuel alternatives avail-

able to them, and the revenue loss which could accrue from the transfer of such firm customers to the interruptible Rate FS. However, we observe that, during the earlier hearings, there was cross-examination which dealt with the possible extension of the rate to customer classes in addition to those under Rate S. (604a-608a, 629a-632a). Moreover, after the ALJ had advised the parties that the extension question should be addressed in the briefs, and after the commission had explicitly raised the matter as noted above, UGI made no request for further hearings to submit any additional evidence on the point, in contrast to UGI's specific request for further hearings to present additional evidence as to sales loss.

We do not agree with the OCA that UGI's opportunity to argue the issue in briefs, along with the somewhat peripheral examination of the factual aspects of this issue during cross-examination, are determinative against UGI on this matter. However, the original rate filing, under investigation throughout the hearings, plainly included the scope of the availability of Rate FS as a definite issue. The proceedings were examining a tariff supplement which, as UGI proposed it, would have confined the Rate FS availability (except as to new customers) only to those existing customers theretofore under Rate S. Thus, from the outset, the propriety of so limiting the availability of Rate FS was part of the proposal before the PUC, the ALJ and the parties. Just as the PUC could have approved and adopted that limitation, in accordance with UGI's desires, the PUC could reject that limitation without straying beyond the boundaries of the case UGI presented to it.

UGI proposed Rate FS to prevent the loss of interruptible customers to the use of oil. The situation of firm service customers who also possess alternative fuel capability thus logically remained in the fore-

ground of the investigation of Rate FS. Aside from considerations of avoiding discrimination among customers similarly situated, UGI's thesis as to preventing fuel-switching had continuing relevance with respect to the Rate LF customers, to the extent that they could attain freedom from contractual restrictions favoring UGI, a constraint which the PUC order recognized.

The possibility of alternative molding of relief is normally and therefore fairly within the contemplation of the tribunal and parties during litigation of an issue; a court or agency must be free to develop an appropriate configuration of the relief in its final order without being required to go back and reopen the proceedings.

We therefore conclude that the scope of Rate FS, in relation to all customers who could possibly switch fuel, was within the bounds of this adjudication from its beginning.

### UGI Appeals—Conclusion

The issues earnestly put forward on behalf of UGI in this case have required this court to examine ratemaking in an economic light different from that which has illuminated previous cases. We recognize that basic utility services—supplying essential commodities such as water, electricity and gas—have traditionally functioned in an environment of inelastic demand. Here, in changing times, the utility has submitted that gas decontrol at the national level is resulting in the market demand for gas becoming more elastic, and we perceive that the PUC has not totally rejected that proposition but, avoiding premature conclusions, has indicated willingness to explore its long-range impact by, for example, explicitly providing in its order that UGI have the opportunity to monitor and report upon how the flexible rate fares. In view of the commission's appropriate steps in that direction, the record

support for the commission's approach in this case, and our limited scope of review, we are unable to sustain UGI's appeals.

## OCA Appeal—Income Tax Expense

In its appeal, the OCA contests only that part of the order which permitted the utility to calculate its federal and state income tax expense for ratemaking purposes on a "stand alone" basis, despite the fact that the utility did not file its own tax return but participated in the consolidated return which its parent filed.[1]

Each subsidiary, both utility and non-utility, calculates its separate income, deductions, tax liability and tax credits on an individual basis. The parent then either collects from the member its calculated tax liability, or reimburses the member if its tax liability is negative. After recalculation on a consolidated basis, the parent files a single tax return, which reflects the net income tax liability of all its corporate members.

The record reveals that the non-utility subsidiaries have historically generated either a negative tax liability or a relatively small positive tax liability which, together with much greater tax credits, produces a net negative figure. The consolidated corporate return, because of the negative liability of those subsidiaries, consistently reflects an aggregate tax liability which is significantly less than the sum of all members' tax liability as individually computed. For example, as the PUC noted, in 1980 the utility claimed an $8 million federal tax expense; however, the corporation, through its consolidated return, paid only approxi-

---

[1] The OCA presented to the PUC a proposed method for adjusting the utility's tax expense to reflect savings from the filing of a consolidated return. Only the underlying question of law, not the merits of OCA's proposal, are before us on appeal.

mately $2 million in federal taxes. The negative tax liability of the non-utility subsidiaries, together with tax credits, was responsible for the disparity between the two figures.

The PUC found that none of UGI's subsidiaries were chronic loss companies, *i.e.*, they did not inevitably produce a negative tax liability before considering their tax credits, and that each member was able to take advantage of its own tax credits. According to its current policy, the PUC concluded that the utility need not, for ratemaking purposes, reflect any tax savings resulting from the consolidated filing, and set the utility's income tax expense for the test year ending December 31, 1982, at $19,433,239.

The OCA argues here that the PUC's conclusion on the consolidated tax issue constituted an error of law by violating the basic ratemaking principle of allowing the inclusion of only those costs actually incurred. We agree.

The cases have established that the setting of public utility rates requires consideration of four basic elements: (1) gross utility revenues, (2) operating expenses, (3) rate base, and (4) rate of return. *Bell Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Co.*, 47 Pa. Commonwealth Ct. 614, 408 A.2d 917 (1979). A utility is entitled to a rate which allows recovery of operating expenses, including a reasonable allowance for income taxes. *Western Pennsylvania Water Co. v. Pennsylvania Public Utility Commission*, 54 Pa. Commonwealth Ct. 187, 190, 422 A.2d 906, 908 (1980).

However, a utility may pass along to its customers only those expenses or costs it actually incurs. *Riverton Consolidated Water Co. v. Pennsylvania Public Utility Commission*, 186 Pa. Superior Ct. 1, 20, 140 A.2d 114, 123 (1958). Any other approach would permit the utility, by charging higher rates than neces-

sary, to gain a profit from its customers under the guise of recovering operating expenses.

Recognizing that tax expenses are merely one element of operating expenses, our courts have, for many years, refused to permit utilities to include in their ratemaking equation tax expenses which, because of participation in a consolidated return, they did not actually pay to the government. *Riverton Consolidated Water Co.*, 186 Pa. Superior Ct. 1, 20, 140 A.2d 114, 123 (1958); *City of Pittsburgh v. Pennsylvania Public Utility Commission*, 182 Pa. Superior Ct. 551, 580-583, 128 A.2d 372, 386-387 (1956); *Chambersburg Gas Co. v. Public Service Commission*, 116 Pa. Superior Ct. 196, 224, 176 A. 794, 805 (1935); *Western Pennsylvania Water Co.*, 54 Pa. Commonwealth Ct. 187, 190-191, 422 A.2d 906, 908-909 (1980). Our Superior Court stated unequivocally that "[t]he only proper tax expense which [the utility] may pass on to its customers is its proportionate share" of the taxes actually paid pursuant to the consolidated return, *Riverton Consolidated Water Co.*, 186 Pa. Superior Ct. at 20, 140 A.2d at 123, and that "the use of a consolidated tax return, the same as the use of the holding system of investment, is of mutual benefit to the [parent] and its subsidiaries. Advantages which result from this system should benefit the consuming public as well as the utility and the parent company." *City of Pittsburgh*, 182 Pa. Superior Ct. at 583, 128 A.2d at 387.

The PUC and the utility contend here that the present case is distinguishable from the above line of decisions because (1) the utility does pay, to its parent, income taxes as calculated on an individual basis and because (2) the consolidated group embraces no chronic loss company.

We recently addressed the first of those arguments in *Western Pa. Water Co.*, as cited above, where we

560

held that a utility may not justify a sum as its proper tax expense merely by paying that amount to its parent as taxes, particularly when the parent remits a much smaller tax amount under a consolidated return. *Riverton Consolidated Water Co.*, 186 Pa. Superior Ct. at 20, 140 A.2d at 123. We see no reason to depart from that position in the present case.

With respect to the second contention, we note initially that the PUC has offered no case or statutory authority to support its "chronic-loss subsidiary" test nor has our research disclosed any such authority. Instead, the PUC argues only that it has applied the policy to cases before the commission.

The decision to file a consolidated return is one which the parent and its member companies must make; we may reasonably conclude that, when they do choose to file on a consolidated basis, they perceive some financial benefit from doing so. A company need not lose money every year in order to produce a net benefit for the consolidated group; as at least one UGI member did,[2] a company may produce a small positive tax liability, but generate tax credits in such an amount that they not only offset the company's own taxes, but provide an offset to the taxes of other subsidiaries which may have large positive tax liabilities.

We find ourselves unable to accept the PUC's narrow interpretation of the cases in this area. No court has ever suggested that a utility must be held to account for the effects of participation in a consolidated return only when one of its sister subsidiaries is a constant loss-generator, and we reject that position in this case.[3]

---

[2] Amerigas, Inc.

[3] Because we conclude that the PUC committed an error of law in its approach to the consolidated tax question, we need not address OCA's argument that the findings were not supported by substantial evidence.

We reverse the PUC's order of December 22, 1982, appealed by the OCA. Accordingly, the January 7, 1983 order also cannot stand, and we must remand for proceedings to implement the conclusions reached here.

### ORDER IN 197 C.D. 1983

Now, November 29, 1983, the orders of the Pennsylvania Public Utility Commission entered or adopted December 22, 1982 and January 7, 1983 are reversed, and the records are remanded for further proceedings consistent with the foregoing opinion, specifically for the adjustment of operating expenses to reflect income taxes for UGI Corporation Gas Utility Division, the utility, on the basis of its proportionate share of taxes actually paid pursuant to the consolidated tax return, rather than upon the basis of the taxes it would pay if it were filing a separate return.

Jurisdiction relinquished.

### ORDER IN 224 C.D. 1983

Now, November 29, 1983, the orders of the Pennsylvania Public Utility Commission entered or adopted December 22, 1982 and January 7, 1983 are reversed, and the records are remanded for further proceedings consistent with the foregoing opinion, specifically for the adjustment of operating expenses to reflect income taxes for UGI Corporation Gas Utility Division, the utility, on the basis of its proportionate share of taxes actually paid pursuant to the consolidated tax return, rather than upon the basis of the taxes it would pay if it were filing a separate return.

Jurisdiction relinquished.

### ORDER IN 225 C.D. 1983

Now, November 29, 1983, the orders of the Pennsylvania Public Utility Commission entered or adopted

December 22, 1982 and January 7, 1983 are reversed, and the records are remanded for further proceedings consistent with the foregoing opinion, specifically for the adjustment of operating expenses to reflect income taxes for UGI Corporation Gas Utility Division, the utility, on the basis of its proportionate share of taxes actually paid pursuant to the consolidated tax return, rather than upon the basis of the taxes it would pay if it were filing a separate return.

Jurisdiction relinquished.