552 A.2d 1135

The Peoples Natural Gas Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

The Peoples Natural Gas Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

The Peoples Natural Gas Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued October 5, 1988, before Judges CRAIG, DOYLE, BARRY, COLINS, PALLADINO, McGINLEY and SMITH.

446

*Joseph J. Malatesta, Jr.,* with him, *William T. Hawke,* and *Kevin J. McKeon, Malatesta, Hawke & McKeon,* and *Susan Garland George,* with her, *William P. Boswell,* for petitioner, Peoples Natural Gas Company.

*John F. Povilaitis,* Deputy Chief Counsel, with him, *Robert P. Haynes,* Assistant Counsel and *Daniel P. Delaney,* Chief Counsel, for respondent.

*David M. Kleppinger,* with him, *Richard S. Kahlbaugh, McNees, Wallace & Nurick,* for intervenor, Peoples Industrial Intervenors.

*Craig R. Burgraff,* Assistant Consumer Advocate, with him, *David M. Barasch,* Consumer Advocate, for intervenor, Pennsylvania Office of Consumer Advocate.

OPINION BY JUDGE CRAIG, January 5, 1989:

The Peoples Natural Gas Company (Peoples) appeals three orders of the Public Utility Commission (PUC or Commission) dated January 9, 1987, March 19, 1987, and September 17, 1987. In general, this case presents the question of whether a tariff filed by Peoples complied with an earlier rate order of the PUC with respect to allocation of the revenue burden among various customer classes.

## History

This dispute began in January 1986 when Peoples filed proposed tariffs for a rate increase that was to go into effect March 31, 1986. The Commission suspended the tariffs for seven months, as allowed by 66 Pa. C. S. §1308(d), to investigate the proposed increase. On September 10, 1986, after hearings, Administrative Law Judge MINDLIN issued recommendations. After the par-

ties submitted exceptions and reply exceptions to the Administrative Law Judge's recommendations, the Commission issued its final rate order on October 31, 1986. That order directed Peoples to change its method of allocating certain costs among different classes of customers in order to reduce the allocation of the rate increase to residential and commercial customers.

Peoples submitted a new tariff, Supplement No. 2, on November 3, purportedly complying with the Commission's October 31 order. The Office of Consumer Advocate (OCA) filed a petition on December 1, claiming that Supplement No. 2 failed to comply with the October 31 order's directive to reduce the allocation of the rate increase to residential and commercial customers.

On January 9, 1987 the Commission issued another order that again addressed the allocation of costs to certain customer classes. Peoples responded to that order by filing Supplement No. 6, which acknowledged itself to be not in compliance with the January 9 order because Peoples planned to appeal the January 9 order and to ask the Commission for a stay. On February 9, 1987 Peoples filed in this court a petition for review of the January 9 order and on February 11 Peoples asked the Commission for a stay or supersedeas pending the appeal of the January 9 order.

On March 19 the Commission issued another order that denied the stay and stated that the Commission would assess Peoples penalties in the amount of one thousand dollars per day unless Peoples complied with the January 9 order within seven days. Peoples filed in this court an application to stay the Commission's March 19 order. On March 25 this court deferred any penalties to be assessed under the March 19 order until we could decide the case. On March 23, Peoples filed a petition for review of the March 19 order.

Senior Judge BUCHER of this court held a hearing on April 1 and issued a stay on April 4. The Pennsylvania Supreme Court dissolved that stay on July 6. On September 1 Peoples filed Supplement 19 to comply with the Commission's directive to reduce the allegedly excessive revenues allocated to residential and commercial users in Peoples' Supplement No. 2. The Commission accepted this filing on September 17. On October 7 Peoples filed a petition for review of the September 17 acceptance letter order and a motion to consolidate its other petitions in this court.

The Commission opposed consolidation and moved to quash or dismiss the petition for review at 2305 C.D. 1987, filed as to the September 17 acceptance letter order. We consolidated, for argument, the petitions for review and the application to quash or dismiss.

## The Issues

Peoples contends that the January 9, March 19, and September 17 orders are in error because the January 9 order constituted an amendment of the Commission's order dated October 31, 1986 (with which Peoples claims to have complied by its Supplement No. 2 filed on November 3, 1986) without providing Peoples with notice and an opportunity to be heard, as required by 66 P.S. §702(g), before amending the earlier order.

The Commission, on the other hand, asks us to dismiss Peoples' petition for review of the September 17, 1987 order, on the ground that Peoples lacks standing because it is not an aggrieved party. The Commission bases this assertion on the fact that the Commission's order in question accepted Peoples' Supplement No. 19, filed in September 1987, as in compliance with the original October 31, 1986 order and the January 9 order, and that Peoples therefore is not aggrieved by that acceptance.

Thus, Peoples, the Commission, OCA and Peoples Industrial Intervenors (PII) have presented essentially three questions for review: (1) whether Peoples lacks standing to bring the appeal at 2305 C.D. 1987; (2) whether the January 9, 1987 order constituted an amendment of the October 31, 1986 order; and (3) whether the Commission's action has precluded Peoples from making a fair return on its service by dictating to Peoples a cost allocation scheme that does not allow a proper recovery of revenue.

We deny the Commission's application to quash Peoples' petition for review at 2305 C.D. 1987, and affirm the Commission's orders dated January 9, 1987, March 19, 1987, and September 17, 1987.

## 1. Standing

We will first address the Commission's application to quash Peoples' petition for review of the Commission's September 17 letter order that accepted Supplement No. 19. The Commission claims that Peoples lacks standing to challenge this order because the Commission's acceptance of Supplement No. 19 constitutes a Commission ruling in favor of Peoples, and that Peoples therefore is not an aggrieved party—a necessary element of standing for the purpose of an appeal to this court. A party may not appeal a favorable ruling. *Prior v. Borough of Eddystone*, 30 Pa. Commonwealth Ct. 536, 374 A.2d 981 (1977), citing *Pierro v. Pierro*, 434 Pa. 131, 252 A.2d 652 (1969).

Although the September 17 order's approval of Peoples' Supplement No. 19 has the superficial appearance of being favorable to Peoples, we must recognize that Peoples was forced to file Supplement No. 19, with content contrary to Peoples' own view, because the Supreme Court's dissolution of the stay left Peoples with no choice but to comply. The Commission order ap-

proving a forced filing, with which the filing party disagrees, is indeed an order having a real effect adverse to that party. This court must conclude that Peoples has standing to attack the September 17 order, as part of the three-order series which subjected Peoples to compliance results claimed by it to be unwarranted.

The Commission's application to quash will be denied.

## 2. Consistency of the Commission's Rate Order and Its Compliance Insistence.

Although Peoples is appealing several 1987 orders, this case turns upon interpreting the Commission's order dated October 31, 1986.[1] That interpretation is necessary to determine whether the January 9 order constituted an amendment of the October 31 order. If the January 9 order actually amended the substance of the October 31 order, this court would have to vacate that later order because the Commission did not provide Peoples with notice and an opportunity to be heard as required by 66 P.S. §703(g) before the Commission issued the January order. *Westinghouse Electric Corporation v. Pennsylvania Public Utility Commission,* 44 Pa. Commonwealth Ct. 407, 404 A.2d 712 (1979).

The Commission's October 31 order directed Peoples to restructure its allocation of the approved rate increase among its customer classes. Specifically, the Commission told Peoples to: (1) allocate a *smaller percentage of the approved increase* to residential and

---

[1] We note that our scope of review of an order of the Commission is limited to determining whether or not constitutional rights have been violated, an error of law has been committed, and whether the Commission's findings are supported by substantial evidence. *Pittsburgh & Lake Erie Railroad Company v. Pennsylvania Public Utility Commission,* 66 Pa. Commonwealth Ct. 609, 445 A.2d 851 (1982).

commercial customers than it had proposed in its rate filing; and (2) allocate a *smaller decrease* in rates to industrial customers. Thus, although the Commission approved a decrease in rates to industrial customers, it directed Peoples to lower the amount of the decrease in rates to industrial customers in order to ensure that the rate increase allocated to residential and commercial customers would not be as great as Peoples had originally requested.

A brief definition of the pertinent concepts may be helpful. In implementing rate orders, the allocation of revenue responsibility among customers looks in part to cost-of-service studies. In gas cases, such studies recognize

> Production of Gas
> Storage of Gas
> Transmission of Gas (large-volume and long-distance piping)
> Distribution of Gas (delivery piping from transmission system to customers)

as distinct *functions*, or functional categories of costs, for accounting purposes.

The Commission must classify specific costs within each function as:

> 1. Demand costs—capital and operating costs which provide the capacity to meet peak demands; or
> 2. Commodity costs—expenses associated with obtaining the energy medium itself; or
> 3. Customer costs—expenses affected by the number of customers served.

Therefore, within each function, the Commission must apportion costs on the basis of varying ratios or percentage factors assigned to the respective demand, commodity or customer element. For example, with respect to the distribution function, size of gas mains (determin-

ing their capacity) relates strongly to demand, but other elements—their number and location—can be related to the customer and commodity factors.

In this case, after the Commission examined Peoples' cost-of-service study and decided to require Peoples to increase the revenue burden on industrial customers and decrease it as to residential and commercial customers, as compared to what Peoples had proposed, the Commission's order at the pages noted, according to our reading, laid down four points:

1. The Commission rejected the attribution of local gas costs entirely to the residential and commercial classes, as Peoples proposed, and required that they be 'distributed across all rate classes on a commodity basis.' (pp. 70, 71)

2. The Commission rejected Peoples' proposal to allocate transmission costs primarily on a demand basis and required that they be allocated on a 50% demand, 50% commodity basis; (p. 74)

3. The Commission rejected the Peoples' 'minimum size' approach with respect to distribution costs and required that distribution costs also be allocated on a 50% commodity, 50% demand related basis, '[c]onsistent with our findings regarding the allocation of transmission costs, *supra* . . . .' (p. 76); and

4. The Commission also clearly declared that the cost of measurement and regulation stations would be treated as distribution system costs—also on a 50% demand, 50% commodity basis—because of their integral relationship to that system. (p. 77)

With respect to revenue allocation, the Commission's basic order concluded as follows:

We agree with the arguments presented by the Trial Staff and the OCA that we should not

allow Peoples to implement competitive industrial rates at the sole expense of residential and commercial customers who are far less responsive to changes in gas prices. However, instead of modifying the Company's proposed revenue allocation directly, as recommended by Trial Staff and OCA, we find that our modification to the Company's cost of service study, discussed *supra,* will both achieve our desired cost assignments and significantly reduce the revenue requirements allocated to the residential and commercial classes. Given these modifications to the cost of service study, we adopt the itemized returns by class of service that were recommended by the ALJ. Specifically, we direct Peoples to revise its cost of service study labeled PNG Exhibit No. 43 with the modifications we have discussed in the Cost of Service section, *supra,* including allocating local production and gathering costs on a commodity basis. Utilizing this modified cost of service study and the total revenue allowance granted by this Opinion and Order, the Company shall file tariffs that are designed to achieve the class rates of return recommended by the ALJ and delineated, *supra.*

Because Peoples did not appeal the October 31 order containing the above allocation directions, that order therefore became the definitive statement of what the Commission required in the compliance filings to follow.

Peoples' original rate request, seeking $19.8 million increase, proposed to allocate the burden of that increase as indicated by the following table, taken from the Commission's brief:

## ORIGINAL RATE REQUEST

| Customer Class | revenue change ($000) | % of total increase |
|---|---|---|
| Residential | $23,677 | 119.24 |
| Commercial | 2,163 | 10.86 |
| Industrial | ( 5,985) | ( 30.00) |
| TOTAL | $19,855 | |

The rate proceeding resulted in the Commission allowing a rate increase in the amount of approximately $7 million instead of $19.8 million. The effect of Supplement No. 2, Peoples' first compliance filing with respect to allocation of the increase allowed is reflected in the following table:

## SUPPLEMENT NO. 2—First Compliance Filing

| Customer Class | revenue change ($000) | % of total increase |
|---|---|---|
| Residential | $ 8,998 | 127.3 |
| Commercial | 1,386 | 19.3 |
| Industrial | ( 3,317) | ( 46.9) |
| TOTAL | $ 7,067 | |

Although the amount of dollars is less, as the table indicates, the percentage of the increase allocated to residential and commercial customers was even greater than originally proposed, and the net relative reduction of the burden of industrial customers amounted to a more substantial reduction. (The table apparently states a net reduction for all industrial customers by combining an increased burden on transportation customers—consisting essentially of industrial users—with a much greater reduction of burden proposed for other industrial customers.)

The extent to which Peoples' Supplement No. 2 departed from the specifics of the Commission's allocation directions, designed to reduce both the increase im-

posed upon residential and commercial, and the net savings which Peoples would allocate to industrial/ transportation customers, is described by a tabular presentation in the Commission's brief, as shown below:

## COMPARISON OF REVENUE ALLOCATIONS
PROPOSED ALLOCATION VS. SUP. NO. 2

One of the important factors which separates the parties here in evaluating Supplement No. 2 apparently is founded on differing views with respect to the treatment of transportation volumes as compared to retail volumes. OCA's witness Donklin had suggested that transportation volumes should be included in allocating transmission costs. In fact, Peoples did include transportation volumes as well as retail volumes in allocating its transmission costs in its Supplement No. 2. Peoples, however, apparently read the October 31 order as directing Peoples only to adopt a fifty percent demand, fifty percent commodity allocation scheme as to distribution costs, without reference to the transportation volume factor. Thus, Peoples did not include transportation volumes in allocating distribution system costs,

even though the Commission directed Peoples to calculate those shares "consistent with our findings regarding the allocation of transmission costs . . . ." Peoples instead apparently adhered literally to OCA witness Donklin's testimony, which included transportation volumes only in allocating transmission costs. This approach, however, contributed to an allocation contrary to the specific directive of the Commission's October 31 order *to reduce the increase to residential and commercial customers*.

In addition, Peoples argues that the Commission's choice of the word "valid" in its January 9 order to describe Peoples' interpretation of the October 31 order suggests an admission by the Commission that Peoples' method of compliance was appropriate. However, by using the word "valid," the Commission merely recognized that Peoples, in good faith, did not purposefully misinterpret the October 31 order—necessarily rather general in its terms—even though Peoples failed to implement the Commission's October 31 instruction to reduce the allocation of the rate increase to residential and commercial customers.

To lower the percentage of increase to residential and commercial customers and to read the October 31 order as internally consistent, Peoples cannot rest upon the OCA witness' testimony that the commodity factor should include transportation volumes only in transmission costs. As factfinder, the Commission may accept part of a witness' testimony and reject other parts; the utility, however, cannot be selective in following the Commission's order. Rather, to reduce the amount of increase to smaller customers, Peoples necessarily must read the October order as directing Peoples to include transportation volumes in allocating distribution system and measurement and regulator station costs as well as in transmission costs.

PII contends that the Commission's decision to allocate the costs of transmission and distribution functions, including measurement and regulator stations in the latter, on a fifty percent demand, fifty percent commodity basis is unreasonable, and that there is no substantial evidence in the record to support this allocation. We disagree.

The establishment of rate structures is an administrative function peculiarly within the expertise of the Commission, so that if the Commission's findings are supported by substantial evidence, we must affirm. *City of Pittsburgh v. Pennsylvania Public Utility Commission,* 106 Pa. Commonwealth Ct. 437, 526 A.2d 1243 (1987).

The Commission has the power to determine the weight and credibility of evidence presented. This court's scope of review does not permit us to engage in weighing evidence and resolving conflicting testimony. *Metropolitan Edison Co. v. Pennsylvania Public Utility Commission,* 62 Pa. Commonwealth Ct. 460, 437 A.2d 76 (1981). The OCA presented testimony that specifically addresses the costs at issue:

> I have classified and ultimately allocated the distribution mains on the basis of fifty percent energy [commodity] and three day peak demand for distribution level customers (classes) to correctly reflect the integrated nature and use of the gas distribution system for both energy [commodity] and peak requirements.
>
> . . . .
>
> The distribution, measuring and regulator station facilities and costs also are an integral part of the distribution main system. Therefore, I recommend that these costs be classified and allocated in the same manner as the integrated distribution main system.

(Reproduced Record, pp. 150-151)

We find that there is substantial evidence in the record to support the Commission's decision to allocate the above-noted costs on a fifty percent demand, fifty percent commodity basis. The January order did not constitute an amendment of the October order.

### 3. Denial of Fair Return

Both Peoples and PII claim that the January 9 order, interpreting the October 31 order, results in a confiscation of Peoples' property by denying Peoples an opportunity to receive the presumably just and reasonable revenue total approved by the Commission in its October 31 order.

Peoples does not challenge the total revenue allowed by the October 31 order, nor does Peoples suggest that the January 9 order changes that total amount. Rather, Peoples' argument is that the January 9 order, by shifting part of the revenue allocation to its industrial customers, precludes Peoples from receiving a portion of its allowable revenue.

Peoples bases this assertion on the claim that Peoples can only reasonably expect to earn a return of $12.466 million from its industrial customers, but that the Commission's orders would require Peoples to collect $13.6 million from that customer class in order to receive its allowed total revenue of $139.9 million.

Peoples' confiscation claim under this heading is based upon revenue predictions offered by its expert witness. Even though those predictions were uncontradicted, the Commission is not obligated to accept those predictions as fact, in the exercise of its administrative expertise in fashioning a rate structure. *Cohen v. Pennsylvania Public Utility Commission,* 78 Pa. Commonwealth Ct. 545, 468 A.2d 1143 (1983), *aff'd,* 507 Pa. 561, 493 A.2d 653 (1985). The Commission was entitled to apply its own experienced modification of those reve-

nue predictions, a modification which is particularly plausible in view of the fact that even the Commission's rate structure determinations have resulted in industrial customers bearing a *reduced* percentage of the total burden, albeit a percentage reduction smaller than that which Peoples originally proposed for its industrial rate-payers. The Commission is entitled to weigh the evidence and reject the utility's market projections as insufficiently convincing. *Cohen.* As the Commission stated on this point in its March 19, 1987 order (p. 9):

> The October 31, 1986 Opinion and Order authorized Peoples to establish rates designed to produce annual gas base rate operation revenues of $377,822,625, which includes a return allowance of $3,517,264. Peoples contends that it will undercollect at least $1.2 million if a stay is not granted. Simply stated, we fail to comprehend how a potential undercollection of $1.2 million, when compared with total allowable annual operating revenues granted and the $3.5 million return allowance granted could possibly amount to irreparable harm to the Company. The potential undercollection of $1.2 million represents a judgmental amount based upon testimony of Peoples' witness as to the amount of revenues the Company might be able to collect from the industrial customers.

## Conclusion

As stated above, the Commission has the role of expert for the purpose of establishing rates among different classes of utility customers, *Park Towne v. Pennsylvania Public Utility Commission,* 61 Pa. Commonwealth Ct. 285, 433 A.2d 610 (1981). Once the Commission performs the administrative task of establishing a rate structure, *Philadelphia Electric Co. v. Pennsylvania*

*Public Utility Commission,* 79 Pa. Commonwealth Ct. 445, 470 A.2d 654 (1984), its findings may not be disturbed if supported by substantial evidence, *City of Pittsburgh v. Pennsylvania Public Utility Commission,* 106 Pa. Commonwealth Ct. 437, 526 A.2d 1243 (1987). After examining the record, we find that there is substantial evidence to support the Commission's allocation of the approved rate increase among Peoples' classes of customers.

## ORDER IN 280 C.D. 1987

Now, January 5, 1989, the order of the Pennsylvania Public Utility Commission, entered January 9, 1987, is affirmed.

## ORDER IN 605 C.D. 1987

Now, January 5, 1989, the order of the Pennsylvania Public Utility Commission, entered March 19, 1987, is affirmed.

## ORDER IN 2305 C.D. 1987

Now, January 5, 1989, the Commission's application to quash at No. 2305 C.D. 1987 is denied, and the order of the Pennsylvania Public Utility Commission entered September 17, 1987 is affirmed.